IN THE MATTER OF THE ESTATE OF HENRY GLICK, ALSO KNOWN AS HENRY H. GLICK, DECEASED. CHRIS GLICK, AS AN INDIVIDUAL AND AS EXECUTOR OF THE ESTATE OF HENRY GLICK, ALSO KNOWN AS HENRY H. GLICK, DECEASED, APPELLANT, *v.* ISABELLE KNOLL, RESPONDENT.

No. 9842.
Submitted October 16, 1959. Decided November 25, 1959.
346 Pac. (2d) 987.

See **C. J. S.** Bastards, § 14.

O'Neil & Cavanaugh, Glendive, Thomas J. Cavanaugh, Glendive, argued orally, for appellant.

Raymond Hildebrand, Glendive, Ralph J. Anderson, Helena, argued orally, for respondent.

MR. CHIEF JUSTICE HARRISON:

Henry Glick, also known as Henry H. Glick, died testate on

April 26, 1955, a resident of Dawson County, Montana, leaving real and personal property therein. His last will and testament was admitted to probate and the sole legatee under the will was named executor, being Chris Glick, brother of the deceased, who was appointed and qualified as such. No other person was mentioned in the will.

Later, and before distribution, Isabelle Knoll filed a petition to determine heirship and thereafter filed a complaint asking for distribution of the estate to her on the grounds that she was a daughter of Edna Miller and Henry Glick; alleging that she was the sole heir of the deceased; that she was unintentionally omitted from the will; and that during his lifetime the deceased, in writing, acknowledged her as his own child, received her into his family and treated her as a legitimate child.

The only other alleged heir who appeared in the action was Chris Glick, who filed an answer both as executor and on his own behalf, generally denying the allegations of the complaint. The court submitted the matter on written interrogatories to the jury which returned specific answers thereto. The court thereupon made findings and conclusions in favor of Isabelle Knoll, and judgment was entered thereon. From such judgment Chris Glick, individually and as executor of the estate, appealed.

While many errors are specified by the appellant they can be covered under four headings. The appellant contends: (1) There was not sufficient or competent evidence to establish an acknowledgement in writing as required by section 91-404, R.C.M. 1947; (2) There was insufficient evidence to establish an adoption, as provided by section 61-136, R.C.M. 1947; (3) The court erred in the submission of unnecessary instructions to the jury; and (4) That the district court had not acquired jurisdiction because of a failure to comply with the provisions of sections 91-3801 and 91-3802, R.C.M. 1947, as amended.

As to the first contention of the appellant, section 91-404,

R.C.M. 1947, so far as pertinent here, reads: "Every illegitimate child is an heir of the person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father of such child * * *."

In support of the allegations set forth in her complaint, respondent testified that she made two trips to Billings, Montana, with the deceased and both times they stayed at the Westward Ho Motel; and that she saw Mr. Glick sign a registration card. The attendant at the motel identified Glick from a picture and stated the card was signed by Glick in his presence. The motel registration card is signed "Henry Glick and daughter." A handwriting expert testified that the handwriting upon the card was that of the deceased. It is true that the motel attendant did not identify petitioner as the person accompanying Glick. Appellant contends that there is no proof whatever as to whom the word "daughter" on the card referred to. We believe there is a factor that appellant overlooks in regard to this card and that is, who would be in a position to supply the information as to this motel registration to the petitioner?

Petitioner resided at Glendive, a distance of over 200 miles east of Billings. This action was filed and tried in the district court at Glendive. Admittedly, the motel attendant did not identify petitioner as the person with the deceased, indicating that he would not know or recognize her. Since there were only three people present at the time of registration, being the deceased, the attendant and the "daughter," it leaves only two people who would know about such registration, the attendant and the "daughter."

Since the proof shows that the attendant did not know or recognize the "daughter," what method would there have been for the attendant to have furnished this information to the petitioner? We think the answer is obvious, there would be none.

Thus we come to the only reasonable explanation of how this

evidence came into the trial, the petitioner was the "daughter" written on the motel registration card and she furnished this information to her counsel who thereupon contacted the attendant and secured the testimony introduced upon the trial.

In In re Adams' Estate, 97 Mont. 70, 32 Pac. (2d) 854, 855, this court stated:

"A writing acknowledging the paternity of an illegitimate child by the father, the execution of which is witnessed by a competent witness, is a sufficient compliance with the statute without regard to the purpose for which the instrument was executed. In re Wehr's Estate, 96 Mont. 245, 29 Pac. (2d) 836."

While we have never had exactly the same fact situation previously presented here before us, a very similar situation however was presented to the Supreme Court of Florida, in the case of Wall v. Altobello, Fla. 1950, 49 So. (2d) 532, where it appeared that one, L. E. Mankin, signed a registration card at a hotel with the entry "L. E. Mankin and daughter." The clerk testified in that case that Mankin signed the card in his presence and in the presence of the daughter and he did identify the daughter as the person representing herself to be the illegitimate child of L. E. Mankin. The applicable Florida statute is identical with the foregoing quoted portion of our section 91-404. The Florida court stated in the Wall case on page 534:

"In Horne's Estate, 149 Fla. 710, 7 So. (2d) 13, is the leading case in this state construing Section 731.29, F.S.A. We there held that the acknowledgement did not have to be formal and that the witness was not required to subscribe to the acknowledgment. The chancellor found the proof to be conclusive that L. E. Mankin signed the hotel register as indicated, that appellee whom he called his daughter, was present, that E. M. Richards, the hotel clerk, was present. The chancellor and the probate judge both found that the evidence was ample to show that appellee was the illegitimate daughter of

L. E. Mankin. We think the record amply supports this finding. Blythe v. Ayres, 96 Cal. 532, 31 Pac. 915, 19 L.R.A. 40.

"The only point of disagreement between the finding of the probate court and the Circuit Court was as to the sufficiency of L. E. Mankin's acknowledgment in writing that he was the father of appellee. We think the entry on the registration card shows that appellee was L. E. Mankin's daughter. If there was no corroborating evidence there might be room for doubt, but that was so conclusive that we think the proof made was ample compliance with the statute. * * * When L. E. Mankin acknowledged himself in the presence of a witness to be the father of one present with him and it was conclusively shown that the person with him was his illegitimate daughter, the petitioner in this case, we think the proof of his paternity was complied with."

It will be noted that the Florida court refers to the corroborating evidence, and since a like situation presents itself here, we will discuss that feature as we proceed to cover appellant's other contentions.

Appellant contends that there was insufficient evidence to comply with the provisions of section 61-136, which provides:

"The father of an illegitimate child by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this chapter do not apply to such an adoption."

In order to comply with the provisions of this statute it was necessary to show: (1) That the child was illegitimate; (2) the paternity of the father; (3) that the father publicly acknowledged the child as his own; (4) received the child into his family; and (5) otherwise treated the child as if it were a legitimate child.

There is no disputing the fact that the evidence discloses

petitioner was born out of wedlock, so the first point can be disposed of.

As to the second point, the paternity of the father, it is clear from the evidence that such fact was proved and the appellant has raised no point herein in that respect, so the second point can be passed.

We come then to the third point, public acknowledgment by the deceased of the petitioner as his child.

Appellant contends that public acknowledgment should be made during minority and cites authorities from California. It would appear to us that the Supreme Court of that state has overruled those authorities in the case of In re Lund's Estate, 26 Cal. (2d) 472, 159 Pac. (2d) 643, 654, 162 A.L.R. 606, in these words:

''We likewise are satisfied that it would be contrary to the purpose of the statute and the public policy of this state, and an unwarranted restriction upon the language used, to interpret it as applying only to *minor* children. Certainly an adult is as interested as is a minor in transmutation of status from illegitimacy to legitimacy and we perceive no compelling reason why the policy of the state favoring legitimation of children should be cut off upon their attaining majority. In Estate of Pico (1877) 52 Cal. 84, this court in a per curiam opinion held that section 230 was applicable only to minor children. Its conclusion was based on the proposition that section 230 appears in the chapter headed 'Children by Adoption' and that the first section in that chapter (section 221) provides 'Any minor child may be adopted by any adult person, in the cases and subject to the rules prescribed in this chapter.' Then follow several sections which unquestionably do apply exclusively to minor children. But section 230, after providing that 'The father of an illegitimate child, by publicly acknowledging it as his own [etc.] thereby adopts it as such,' concludes with the sentence, 'The foregoing provisions of this chapter do not apply to such an adoption.' We think it reasonable therefore,

and more consonant with our view of the state's policy, to construe the statute as it stands enacted, neither adding to nor subtracting from its words, and to hold that its benefits are available to all so-called illegitimate children (who in truth could be more accurately referred to as the natural children of illegitimate parents) whether they be minors or adults and whether the acts essential to effectuate their legitimation occur during their minority or later. 'When a statute * * * is equally susceptible of two interpretations, one in favor of natural right, and the other against it, the former is to be adopted.' Code Civ. Proc., section 1866.

"It is also to be observed, as strengthening our conclusion in respect to differentiating the applicability of section 230 from that of other sections in chapter II of title II, part III, division I of the Civil Code, that there is a natural and basic difference between the adoption of blood strangers and the adoption by legitimation of a natural child. Concerning the difference, Justice Garoutte in Blythe v. Ayres (1892) supra, 96 Cal. 532, 559, 31 Pac. [915] 916, 19 L.R.A. 40, said: 'Before passing to the merits of the discussion, we pause a moment to say that the verb "adopts," as used in the section 230, is used in the sense of "legitimates," and that the acts of the father of an illegitimate child, if filling the measure required by that statute, would result, strictly speaking, in the legitimation of such child, rather than in its adoption. Adoption, properly considered, refers to persons who are strangers in blood; legitimation, to persons where the blood relation exists. See law dictionaries,—Bouvier, Black, Anderson, and Rapalje. This is the distinguishing feature between adoption and legitimation, as recognized by all the standard law writers of the day who have written upon the subject; and, for the reason that the text writers and decisions of courts to which we shall look for light and counsel treat the subject as a question of legitimation, we shall view the matter from that standpoint. Webster's New International Dictionary, second edition, says "legiti-

mate" means "To put [a bastard] in the position or state of a legitimate child before the law, by legal means;—distinguished from adopt, which has no reference to blood relation.' See, also, Estate of McNamara, (1919) 181 Cal. 82, 86, 183 Pac. 552, 7 A.L.R. 313.

"So considered, it becomes the more obvious that it is reasonable to conclude that the Legislature by declaring in section 230 that 'The foregoing provisions of this chapter do not apply to such an adoption,' i. e., to *legitimation,* meant to confer the broad benefits of that procedure without the limitations express or implicit in ordinary adoption proceedings. Estate of Pico, (1877) supra, 52 Cal. 84, to the contrary (and which is in effect and on reason inconsistent with Wolf v. Gall, (1916) supra, 32 Cal. App. 286, 295, 296, 163 Pac. 346), is overruled; dicta, based on Estate of Pico, appearing In re Jessup, (1889) 81 Cal. 408, 421, 21 Pac. 976, 22 Pac. 742, 1028, 6 L.R.A. 594, and in Estate of Heaton, (1902) 135 Cal. 385, 387, 67 Pac. 321, are disapproved."

It appears to us that such interpretation is the proper one.

What evidence here indicates that such public acknowledgment was made? The record shows that Henry Glick farmed in the Bloomfield area of Dawson County, Montana, from 1910 until his death. He at one time was married but was divorced in 1914 and never remarried. His home residence at the time petitioner was born consisted of a one-room kitchen, living and dining room combination with a lean-to for a bedroom which had no door but merely a blanket hung in the doorway. The mother of petitioner lived about one and one-half miles southeast of Glick's place. In 1934 when petitioner was about two years old her mother, being employed upon a farm about a mile and a half northwest of the Glick place, moved there with petitioner. The mother married her employer in 1935 and they continued to live at the same place for twelve years, after which time petitioner went to Glendive to attend high school. She left high school after two

years and went to work, first as a domestic for a few months and then as a waitress in various cafes in Glendive, an occupation she still follows.

When petitioner was about twelve years old, Glick commenced to go to California in the fall and stay through the winter, returning to his farm for the summer months.

Petitioner's mother testified that when the child was four or five years old deceased came to her home to visit petitioner and brought her candy, and later brought her clothes. She informed the child in Glick's presence that he was her daddy. Later she testified he brought over a catalog and told the mother to make out an order for petitioner's clothes which she did and later deceased brought the clothes to the home and delivered them to the child. When the child was about ten years old deceased asked to take her to Glendive with him and he did. At about this same time he took the child to his home to visit and brought her back. Later he sought permission from the mother to keep her at his home overnight, usually on a week end and he did so about two dozen times during the years she was in grade school. The mother testified as to the receipt of letters by the child from deceased, also gifts which he sent to her. While in high school at Glendive the mother usually took her in following the week end spent at the farm home and deceased at times brought her home.

Petitioner testified as to the receipt of the clothes and the comment by her mother that they were from her daddy, of deceased bringing over the catalog from which selections of clothes were made which were later delivered to her by him, and of her trip to Glendive with him. She identified one Elmer Johnson as accompanying them on this trip and that the car was parked at the side of the Jordan Hotel. She stated that deceased on that occasion gave her a five dollar bill to buy whatever she wanted. She testified when she was about eleven years old deceased took her for a ride, they looked at the crops and went to his home where they had coffee, visited,

and then he returned her home. She testified to the occasions when she visited and stayed overnight with deceased, estimating the number of times from 20 to 24, usually on week ends. On these occasions she would usually go in the late afternoon of Saturday, stay overnight, go to church with deceased on Sunday and then he would bring her home. On these visits, she stated, deceased reminded her that he was her father; that his home was her home at any time; that he wanted her to come over; and that she was welcome. He also told her he would like to have her all the time if it were possible, but he knew it was not. She named other persons who were present in deceased's home on these occasions. She testified as to deceased's going to California for the winter months, and during his absence writing to her about once a week and she replying. She recounted the receipt of personal gifts, a check at the time of her marriage, and other checks at Christmas in various years. While attending high school deceased often came to the place where she stayed in Glendive and gave her rides to school and also back to the house, as well as taking her to the farm house. In 1954 deceased gave her the use of his car for about two weeks, and advised the service station to charge the gas to him. She recounted other instances where deceased and she made trips together in his car. Before she married she took her boy friend to Glick's farm home and introduced him to Glick by saying: "I would like you to meet my father." After their marriage they visited Glick in California and at that time Glick stated to a neighbor with whom he was visiting: "I would like to have you meet my daughter and her husband, they are from Montana." Deceased entertained them in California, took them for dinner, rides, shows, picnics, paid their motel bill and on the second night put them up at his home. That in 1952 Glick had an accident and while confined to the hospital she visited him every day and sent him flowers. She testified as to visiting the Stanleys and Bidwells in Billings in company with the

deceased, and identified pictures of herself and deceased taken on that trip.

Louis Mullett testified he had known Glick since 1916, had worked for him and lived at his place, had also worked with him elsewhere than on the farm; and that in November of 1938 in a conversation with Glick, Glick told him a child had been born as a result of his actions with petitioner's mother. In the fall of 1945 he saw petitioner visiting at the Glick farm. In 1946, in a conversation with Glick concerning petitioner Glick asked him if he didn't think he had a fine daughter.

Margaret DeCarlo, who was also employed in the cafe where petitioner worked, testified to meeting petitioner and Henry Glick in the cafe in the spring of 1953, at which time it was made known to her that Henry Glick was the father of petitioner. She further stated that petitioner and Glick left the cafe together.

· Earl Stanley testified that petitioner stayed with him and his wife in Glendive while attending high school, and Henry Glick came to his residence several times and took petitioner for a car ride or to a show, and after the Stanleys moved to Billings in June of 1954, petitioner and Glick called at their home.

Raymond Nehrud testified that Henry Glick introduced the petitioner to him as his child in the cafe in the fall of 1954, at that time advising Nehrud that the petitioner was his only child.

Mrs. Bidwell, who had known Henry Glick all her life, testified that in June of 1954, petitioner and Glick visited her in Billings where she then lived and during the course of the conversation Glick was asked: "Didn't the trip tire you pretty much?" or words to that effect, and he replied: "I'm not tired at all, my daughter drove most of the way," referring to petitioner.

Gilbert Bos testified that he had known Glick, and at one

time when he and Glick went to the cafe for coffee Glick stated, referring to petitioner "You know that Issy [a nickname for petitioner] is my daughter" and upon the witness stating that he did not know it, Glick asked her to tell him, and she did.

The husband of petitioner testified that when he first met Mr. Glick he was introduced to him by the petitioner as her father and before they were married they were out to his farm several times to visit. When they went to California on their honeymoon and visited deceased he introduced them to a neighbor as his daughter and her husband and explained that they were on their honeymoon.

To the contrary, Chris Glick testified that his brother never introduced petitioner to him, or other members of his family, as his daughter, or revealed the existence of the child to them. Chris Glick lived in the same neighborhood with Henry Glick, though at times several miles apart, until 1945, when he moved east and apparently he returned on a visit in 1953. Chris Glick at some time between 1945 and 1953 heard a rumor with regard to the parentage of petitioner, because when asked when he first knew she claimed to be Glick's daughter he replied, "I never heard it until we moved away in 1945.

"Q. Subsequent to 1945. A. Yes sir.

"Q. By what means did you learn it? A. I didn't hear of it by any direct means.

"Q. How did you hear, or what did you hear, or how did you hear it? A. I can't explain that, there was quite a rumor and I heard the rumor of it."

Later on in his cross-examination he inferred he did not know it in 1945, but he then stated: "I didn't know a thing about it, I heard a rumor when I came out in 1953, up until that time I never heard one single thing about it."

Elmer Johnson went to work for Glick in the fall of 1944, and lived there during harvest time, worked there every fall until 1947, and has lived on the place since. He had seen

petitioner there but she never stayed overnight that he knew of, and he testified Glick never mentioned she was his daughter. He did recall coming into Glendive with the two of them at one time and the car being parked at the Jordan Hotel but he thought it was parked in front of the hotel. He did not recall any five dollar bill given to petitioner by deceased on that occasion.

Emma Glick, who lived many years in the Bloomfield area but moved away in 1937, testified to a conversation between Glick and the mother of petitioner in September of 1931, being about four months before the birth of the child, which she heard by eavesdropping, in which Glick denied he was the father. The mother of petitioner denied any such conversation took place. Emma Glick further testified that she was a frequent visitor at Henry Glick's home, never saw petitioner there at any time, and petitioner never stayed there overnight while she was there. After she left that area she moved to California and Glick visited her during the winter months, sometimes spending the winter with her. She saw petitioner and her husband when they came to California after their marriage, at which time they came to her home where she said deceased was living at the time. She stated they did not stay at her home, that deceased never referred to petitioner as his daughter and in reply to the question: ''Did he deny to you that he was her father?'', she answered: ''Many times.'' She also testified to a conversation with deceased relative to petitioner wherein he said: ''I am going to write Isabelle a letter and tell her to leave me alone. I don't want to have anything to do with her and don't want her to keep pestering me.'' She admitted on cross-examination that while in California Glick occasionally got a letter from petitioner, but not every week. She further stated that Glick could have received letters that she would not know about.

It appears to us that the record abounds with open public acts and declarations on the part of deceased acknowledging

the child as his own. The contradictions in the testimony arise only from witnesses with an adverse interest. Chris Glick stands to receive the estate of his brother if petitioner's contentions are not sustained. Elmer Johnson is operating the farming property for the executor. Emma Glick was married for a number of years to a man named Vincent Glick who, while no relation, was raised by Chris Glick. These are the only witnesses who contradict any portion of the case made by petitioner and for the most part such contradiction is very limited.

Section 61-136, was adopted from the California Code and the Supreme Court of that state has held that their identical section should be given a liberal construction. That court in Blythe v. Ayres, 96 Cal. 532, 31 Pac. 915, 926, 19 L.R.A. 40, said:

"Bearing upon both branches of this case, as to the policy of the law and the true principle of construction to be invoked, we quote the apt language of Beatty, C. J., in the Jessup case, at page 435 of 81 Cal., at page 750 of 22 Pac., and the views there expressed in no wise conflict with the principles declared in the main opinion of the court. He says: 'The only argument that can be made against his claim to inherit his father's estate rests upon a strict construction of the statutes remedial in their nature, designed to secure to innocent unfortunates in his situation a just measure of the rights to which they are by nature as fully entitled as are legitimate offspring. No doubt a strong argument can be built on this basis of strict construction against the decision of the superior court. But I adhere to the view so strongly put and so satisfactorily maintained by Justice Works in his opinion: that in cases of this kind the only strictness required is in proof of paternity. That being satisfactorily established by plenary proof, I think courts should lean strongly in favor of a finding that the father of an illegitimate child has done what every honest and humane man should be not only will-

ing, but eager, to do, and what a just law would compel the unwilling to do. I also think it a wholly unauthorized construction of the statute that the acts of recognition, acknowledgment, etc., necessary to legitimize a natural child, should be performed with the express intention on the part of the father of accomplishing that object. If the acts are in themselves such as the statute prescribes, I think they confer legitimacy without any reference to the intent with which they are performed. There is no danger to morality in recognizing the natural rights of illegitimate children, as against their fathers, or other claimants of their estates; and there is no danger of encouraging the fabrication of spurious claims, so long as strict proof of paternity is insisted upon'.''

We concur in such interpretation.

In our opinion there is sufficient evidence to sustain a finding that deceased publicly acknowledged the child as his own.

Discussing then the fourth point, that the father received the child into his family, appellant insists that there is no showing on behalf of petitioner in this respect because the record discloses that the petitioner always intended to return home from her visits to the deceased; that she was provided for by the husband of her mother; that she visited others besides the deceased; and that she never used the name of Glick.

Respondent on the other hand insists that the evidence, disclosing that deceased took her into his home for overnight visits and that petitioner visited the deceased's home an average of one to three times a year from her early years until her marriage, when considered in light of the fact that deceased was at all times a single man, living alone on a farm except for an occasional employee, and that his home for many years consisted of a one room, kitchen, living and dining room combination with a lean-to for a bedroom which had no door, but merely a blanket hung in the doorway, indicates that deceased did receive the child into his family as far as it was humanly possible to do under the circumstances existing.

Appellant lays much stress on the case of In re Cook's Estate, 63 Ariz. 78, 159 Pac. (2d) 797. We believe that case to be distinguishable from this in that Cook never made a public acknowledgment, rather he publicly denied he was the father, and while his wife was living he never received the children into his family, in fact there was no proof his wife ever knew of the children.

We have examined many cases in which the requisites of reception of the child into the family of the father are discussed. Among them are In re Jones' Estate, 166 Cal. 108, 135 Pac. 288, In re Buffington's Estate, 169 Okl. 487, 38 Pac. (2d) 22, and In re Gathing's Estate, 199 Okl. 460, 187 Pac. (2d) 981, and it is evident that no hard and fast rule can be laid down to fit all situations. Each case presents a different set of facts and what in one case would suffice can easily be held to be deficient in another. So in this case, after reviewing the evidence we feel there exists a sufficient showing to comply with this rquirement of our statute.

We will now discuss the last point, that being, whether or not the deceased otherwise treated the petitioner as if she were a legitimate child.

Respondent asserts that the facts disclosed by the evidence that deceased corresponded with petitioner; on occasion bought her clothes and gave her gifts; visited her at her boarding place while she was going to school, on occasion drove her back and forth to school; took her on car rides, to church and shows; and allowed her to drive his car, all show that he was treating petitioner as a father would treat a legitimate child.

On the other hand, appellant contends that in this respect deceased bought clothes and gave gifts to other people, omitted any reference to petitioner in his will, and that petitioner having never assumed his name, would show a contrary intention.

As to the treatment to be accorded the child by a father we are impressed by the following language in Blythe v.

Ayres, supra, 96 Cal. 532, 31 Pac. 915, 923, 19 L.R.A. 40, that "The statute clearly means that the father must treat his illegitimate child as he would naturally treat his legitimate child, not as the majority of men in his financial circumstances would or should treat their children. Every man furnishes the rule by which he must be measured. No imaginary standard of excellence can be created, and then it be demanded that Blythe shall rise to that standard."

Appellant recognizes that it would not be strictly necessary that the child live in the same house as the father to satisfy this requirement, but does insist that in other respects the father should treat the child in the same manner as might be expected of him in the case of a natural child. This requires the setting of a standard which this court cannot do. All of us have seen treatment of a natural child by a father that we could not condone and which certainly would be no criterion. As was said in In re Heaton's Estate, 139 Cal. 237, 73 Pac. 186: "The criterion referred to in the statute is the treatment usually accorded to legitimate children."

Looking at the evidence in this cause with regard to this point there appears only one fact that should cause reflection, the omission of any reference to petitioner in the will. His will is very simple. Therein he devises and bequeaths all his property to his brother Chris, who is named as executor. The will does not mention any other relative, has no provision disinheriting any other of his relatives, and does not state that he is a single man.

We do not feel that this one factor should prevail to overturn the many instances apparent in this cause where he treated petitioner in a manner which appeared to the district court and to us as the way one in his station in life would have treated a natural daughter.

We hold that the corroborating evidence is conclusive to establish an acknowledgment in writing as required by sec-

tion 91-404, and further that the evidence was sufficient to establish an adoption as provided by section 61-136.

In the third group of specifications of error set forth by appellant, he contends certain instructions were unnecessary as covering matters not before the jury for consideration. While appellant insists these instructions served no purpose other than to mislead and confuse the jury, we are not disposed to that view. The instructions covered phases of the case then before the jury, and we fail to see where they could in any way be deemed prejudicial, and we hold it was not error to give them.

Appellant contends that respondent may not avail herself █ of both sections 91-404 and 61-136, because they are alternate methods by which a person may become an heir of his or her father. While In re Garcia's Estate, 34 Cal. (2d) 419, 210 Pac. (2d) 841, holds the corresponding California sections to be two alternate methods it does not hold that both might not be used in a given case. In Blythe v. Ayres, supra, 96 Cal. 532, 31 Pac. 915, petitioner based her rights under the California Code sections which were identical to ours, and the court held that she had complied with both sections, indicating that the petitioner there had the right to prove her case under either or both of the statutes. Here respondent pled under both sections and offered proof of her right to inherit under both, no objections were ever raised and if thereby the point was not waived, it is not tenable under the authorities.

The appellant also specified as error the district court's failure to submit to the jury for answer, sufficient interrogatories to determine all of the elements necessary to establish petitioner's case. To be more specific, appellant argues that the court erred in failing to submit to the jury the question of whether or not the deceased publicly acknowledged petitioner as his child, and that therefore the court could not conclude that petitioner had been adopted, as provided in sec-

tion 61-136. The basis for this argument is section 93-5201, R.C.M. 1947, which states:

"The verdict of a jury is either general, or special. A general verdict is that by which they pronounce generally upon all or any of the issues, either in favor of the plaintiff or defendant; a special verdict is that by which the jury finds the facts only, leaving the judgment to the court. The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented that nothing shall remain to the court but to draw from them conclusions of law."

Appellant contends that the jury's verdict was a special verdict based on interrogatories given them, but that since they were given no interrogatory as to the question of public acknowledgment that question did remain for the court to find as a fact, in violation of section 93-5201, and hence the verdict is not sufficient to sustain the judgment.

It is certainly true that before a special verdict can be sufficient to sustain a judgment based thereon, it must find all the facts which are necessary to enable the court to determine which party is entitled by law to the judgment. Coburn Cattle Co. v. Small, 35 Mont. 288, 88 Pac. 953. However, in this case the sufficiency of the jury's verdict is immaterial, since it is only advisory. At the trial, both parties moved the court to withdraw the issues from the jury and to adopt findings of fact and conclusious of law in their favor. In effect, both parties moved for a directed verdict. Such motions were denied. However, it is the settled law in this jurisdiction that when both parties move for a directed verdict, in the absence of a request, that the jury be required to determine any question of fact, there is a waiver of the right to trial by jury and the court is constituted a trier of all questions of law and fact. Hollingsworth v. Ruckman, 72 Mont. 147, 156, 232 Pac. 180; Harvey E. Mack Co. v. Ryan, 80 Mont. 524, 533, 261 Pac. 283; Electrical Products

Consolidated v. El Campo, Inc., 105 Mont. 386, 390, 73 Pac. (2d) 199; Granier v. Chagnon, 122 Mont. 327, 334, 203 Pac. (2d) 982. Since the court in this case was the trier of fact, it could request the jury's judgment upon any question in dispute if it so desired, but was not in error in submitting only a part of the questions of fact necessary to the determination of the case, since it had the power to determine all such questions itself. See Harvey E. Mack Co. v. Ryan, supra; Hollingsworth v. Ruckman, supra; Electrical Products Consolidated v. El Campo, Inc., supra.

Appellant raises the question of the jurisdiction of the trict court for the first time here on appeal. It is appellant's contention that the district court had no jurisdiction to determine heirship because the State of Montana was not notified of the proceeding and because the district court failed to enter an order establishing proof of service on the interested parties, as is required by section 91-3801, R.C.M. 1947, as amended by section 1, Chapter 28 of the Session Laws of 1951.

First, it is apparent from a reading of sections 91-3801 and 91-3802, that only in cases where a nonresident alien heir, legatee and/or devisee has or may have an interest in a decedent's estate is the State of Montana a necessary party, and only then must notice to the State of Montana be given. Here no such nonresident alien heir, legatee or devisee is involved and the State of Montana has no interest, save for inheritance tax purposes.

Appellant's contention that the district court's failure to issue an order establishing proof of service operated to deprive it of jurisdiction has no merit. Section 91-3801 provides that "upon proof of which service, by affidavit or otherwise, to the satisfaction of the court or judge, the court or judge shall thereupon acquire jurisdiction * * * the court or judge must enter an order establishing proof of the service of such notice."

Here, an affidavit of publication of notice was filed along with an affidavit of mailing of notice to the interested parties, executed by the deputy clerk of court. No objection was made as to this proof of service. Nor was there any question that appellant was served. Appellant answered to respondent's petition to determine heirship, filed a designation of attorneys to appear for him in the matter of the determination of heirship, and demurred to respondent's complaint setting forth her claim of heirship. We think that when proof of service was made, the court thereupon acquired jurisdiction. Section 91-3801 is substantially identical to section 1664, California Code of Civil Procedure, which was in effect there until 1931. The exact question raised here was decided by the Supreme Court of California in 1930 in Edlund v. Superior Court, 209 Cal. 690, 694, 289 Pac. 841, 842. The court there said:

"The sole question presented is whether the law imposes upon the respondent court the duty to enter the order requested. Section 1664 of the Code of Civil Procedure provides for the filing at any time after the expiration of six months from the issuing of letters testamentary or of administration, of a petition to establish heirship and upon such filing for an order directing service of notice to all persons interested in the estate to appear and show cause, etc., which notice shall be served in the same manner as a summons in a civil action. The section then states: 'Upon proof of which service, by affidavit or otherwise, to the satisfaction of the court, the court shall thereupon acquire jurisdiction to ascertain and determine the heirship, ownership, and interest of all parties in and to the property of said deceased * * *. The court shall enter an order or decree establishing proof of the service of such notice.'

"It is obvious from a reading of the section that the court before which the proceedings are initiated and which makes the order directing service of notice to all interested parties to show cause, etc., acquires jurisdiction upon proof of due

service. No objection to the proof of service was made before the respondent court, and satisfactory proof of such service is admitted by the demurrer to the petition. The entry of an order, it must be apparent, is merely a formal step in the exercise of the jurisdiction thereby acquired and is mandatory, if no valid objection can be made to the entry thereof.''

For the reasons stated the judgment is affirmed.

MR. JUSTICES BOTTOMLY, ADAIR, ANGSTMAN and CASTLES, concur.