No. 85-419

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

---

NORTHWESTERN NATIONAL BANK OF GREAT
FALLS, a National Banking association,

Plaintiff and Appellant,

-vs-

WEAVER-MAXWELL, INC., a corporation,
et al.,

Defendants and Respondents.

---

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable John McCarvel, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Church, Harris, Johnson & Williams; Milton Wordal
argued, Great Falls, Montana

For Respondent:

Graybill, Ostrem, Warner & Crotty; Turner C. Graybill
argued, Great Falls, Montana

---

Submitted:  August 12, 1986

Decided:  November 13, 1986

Filed: NOV 13 1986

<u>Ethel M. Harrison</u>
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Norwest Bank Great Falls, N.A. (the Bank) appeals a $2,659,671 judgment entered against it in Cascade County District Court after a jury trial. The Bank brought the action as a foreclosure suit and to obtain a deficiency judgment. Defendants prevailed on their counterclaims for breach of contract, tortious interference with their franchise agreement, fraud, negligent misrepresentation, and bad faith in liquidation of the Weavers' collateral. The Court also granted defendants equitable relief. We reverse and remand for a new trial.

The dispositive issue is whether the District Court erred in giving the jury a special verdict form which presented the issue of breach of contract in terms that adopted the defendants' view of substantial disputed facts. For the guidance of the court and counsel on remand, we will consider briefly the other issues raised on appeal. They are:

2. Did the District Court err in the manner in which it submitted the issue of tortious interference with contract to the jury?

3. Did the District Court err in entering judgment upon the special verdict:

a. by entering judgment on the jury's findings of damages both for breach of contract and for tort; and

b. because the special verdict's award of punitive damages conflicted with the jury's finding that the Bank had acted in good faith?

4. Did the District Court err in its resolution of the issues reserved for its decision by:

a. denying the Bank's claim for a deficiency judgment;

b. ordering the Bank to surrender to defendants the proceeds of liquidation of collateral;

c. awarding prejudgment interest at a rate of 18%; and

d. basing an award of attorney fees to defendants on their recovery on both their contract and torts claims?

Weaver-Maxwell, Inc. was an International Harvester (IH) truck and farm equipment dealership. Its stockholders are the other defendants in this action. Beginning in 1977, it entered a series of transactions with the Bank. As of April 1980 Weaver-Maxwell owed the Bank slightly over $700,000 in principal and accrued interest on two SBA guaranteed loans and on its floor plan and accounts receivable lines of credit. The banker in charge of the Weaver-Maxwell account was Paul Hoffman.

As is typical of floor plan financing, Weaver-Maxwell's floor plan arrangements with both IH and the Bank provided that the lenders had a security interest in all items of inventory financed and in the specific proceeds of sale of each item. Weaver-Maxwell had agreed to hold the proceeds of each sale, as well as the inventory, in trust for the respective lender, and it was required to remit a portion of these proceeds to the lender promptly upon receiving them, without demand or notice. When Weaver-Maxwell failed to account for such proceeds, the sale was "out-of-trust."

In March 1980, for the second time within a year, Weaver-Maxwell was in default of its payments on the two SBA loans. Mr. Weaver approached Mr. Hoffman at the Bank seeking another loan for Weaver-Maxwell. Mr. Hoffman refused to make a loan to Weaver-Maxwell. However, the Bank did agree to make a personal loan to Mr. and Mrs. Weaver in the amount of

3

$84,291.69. The loan was secured by personal assets of the Weavers.

The terms of the loan were in dispute at trial. Mr. Hoffman testified that the amount was precisely calculated and all of its proceeds were earmarked for specific purposes. He testified that the $84,291.69 was to be applied as follows: $22,000 was to cover two IH trucks sold out-of-trust; $23,060 was to bring current delinquent payments to the Bank on an SBA-guaranteed loan; $17,492 was to bring the other SBA guaranteed Bank loan current; $21,669.04 was for the balance due the Bank on a 1979 individual loan to Mr. Weaver; and $70.65 was for interest. Mr. Weaver, on the other hand, testified that the loan was earmarked only to the extent necessary to cover the $22,000 in out-of-trust IH sales, and that the rest was to be used for Weaver-Maxwell's general business needs. The loan was documented March 24, 1980, in a promissory note from the Weavers to the Bank. There was nothing in writing signed by the Weavers which mentioned any specific purpose or purposes for the loan. The cash was not immediately advanced to the Weavers, pending filing of documents showing the Bank's security interest in Weaver assets.

On April 3, 1980, the Bank advanced $26,848.45 on the March 24 note, to cover the $22,000 IH out-of-trust previously disclosed and another $4,848.45 out-of-trust which had not been disclosed to the Bank previously and was not included in Mr. Hoffman's calculation. The next day, (a Friday) Mr. Weaver requested another $47,000, to cover yet another out-of-trust amount owed to IH on a sale made several months earlier. The Bank had not been informed of this out-of-trust sale before this time. Mr. Weaver was to return to the Bank on Monday, according to his testimony, to receive the $47,000

4

out of the sums available from the March 24 note. He testified that when he went to the Bank to pick up the $47,000 on Monday morning, Mr. Hoffman told him, "We're not going to advance you the money," and that Mr. Hoffman would not say more than that. Mr. Hoffman's testimony was substantially different. He testified that the $47,000 was a new loan request, and that he told Mr. Weaver a decision whether to grant it would be made by Monday. Mr. Hoffman testified that on Monday morning he concluded after talking with his supervisor that the $47,000 loan request should be declined because "I had lost my confidence in our borrower."

IH immediately notified Mr. Weaver that it was terminating Weaver-Maxwell's dealership because of the out-of-trust situation. To prevent IH from quickly repossessing Weaver-Maxwell's assets, Mr. Weaver signed a document entitled "Peaceful Possession of Collateral Property." The document allowed the Bank to take possession of the assets. The Bank viewed this as a means of protecting its security interests. That evening, the Bank changed the locks on the Weaver-Maxwell buildings. It thereafter excluded Mr. Weaver from the property except during business hours, when he was accompanied by bank representatives. After April 9, the Bank also seized and opened all mail addressed to Weaver-Maxwell. Defendants presented testimony that the Bank destroyed truckloads of Weaver-Maxwell records by hauling them to the Great Falls dump. Approximately two months later, the Bank held an auction of Weaver-Maxwell assets. The defendants argued that the auction was not well-run. The proceeds of the auction were applied to Weaver-Maxwell's debts to the Bank, but they did not cover all the debts. The Bank also collected personal assets of the Weavers in which it had security interests.

5

The Bank commenced this action to collect sums remaining due on its loans to Weaver-Maxwell and the Weavers. The defendants asserted counterclaims based on their contention that the Bank had breached its March 24, 1980 contract to loan money to Mr. and Mrs. Weaver. They also raised claims arising from the Bank's liquidation of their assets. The case was tried to a jury over a three-week period. The jury awarded damages to defendants of $300,000 for breach of contract, $800,000 on tort theories, and $40,000 for bad faith in the liquidation of the Weavers' personal assets. It also awarded the defendants $140,000 in punitive damages. The District Court entered judgment on both the breach of contract and tort damages. It denied the Bank's claim for a deficiency judgment of $377,702.73. It ordered the Bank to remit to defendants $729,073.74 from liquidation of the loan collateral. It also awarded defendants $266,597.26 in pre-judgment interest and $384,000 in attorney fees, for a total judgment of $2,659,671 plus interest.

I

Did the District Court err in giving the jury a special verdict form which presented the issue of breach of contract in terms that adopted defendants' view of substantial disputed facts?

The evidence on whether Mr. Weaver's request for $47,000 should have been considered as part of the $84,291.69 loan was lengthy and conflicting. Both sides presented expert and lay opinion testimony on whether the Bank was obligated to advance the $47,000. The testimony of Mr. Weaver and of Mr. Hoffman also directly conflicted on whether Mr. Weaver requested the $47,000 as a disbursement of part of the

6

$84,291.69 loan or as a new loan. This testimony was admitted into evidence without objection.

The jury was not asked whether Mr. Weaver was entitled to $47,000 cash out of the note for this application. Instead, the District Court adopted the defendants' proposed special interrogatory as jury instruction number 1:

> 1. A. On April 4 or 7, 1980, did Art Weaver request Northwestern National Bank to advance approximately $47,000 on the Weavers' note of March 24, 1980, in order to pay a debt of Weaver-Maxwell, Inc. to International Harvester?
>
> Answer: _____ (yes or no)
>
> B. If your answer to question No. 1 is "yes," please state the total amount of damages which the Bank's breach of contract proximately caused each of the defendants to suffer when the Bank refused to advance such funds?
>
> Answer: Weaver-Maxwell, Inc.  $_____
> Art & Grace Weaver  $_____
> Darlow & Ruth Maxwell  $_____

In substance, this required the jury to determine whether Mr. Weaver asked the Bank to advance $47,000 on the March 24 note. If they answered "yes" then the next determination was the amount of damages which the breach caused the defendants.

"While it is within the trial court's discretion to structure the form and frame the questions of a special verdict, the interrogatories must be adequate to enable the jury to determine the factual issues essential to judgment." Kinjerski v. Lamey (Mont. 1981), 635 P.2d 566, 567, 38 St.Rep. 1703, 1705, citing Glick v. Knoll (1959), 136 Mont. 176, 346 P.2d 987; Coburn Cattle Co. v. Small (1907), 35 Mont. 288, 88 P. 953. We conclude that the special verdict submitted on this record was inadequate. In fact, the Bank agrees that Mr. Weaver was still entitled to $47,000 out of the $84,291.69 loan. However, it was the province of the

7

jury to decide if Mr. Weaver was entitled to apply $47,000 on the new out-of-trust obligation to IH. That central issue was not submitted to the jury. Under this record, it was essential that the judge leave the factual determination of the nature of the agreement to the jury. Instead, the District Court reached the conclusion that the Bank was obligated to loan the $84,291.69 for any purpose Mr. Weaver desired and therefore only left the jury to determine whether Mr. Weaver asked for the $47,000. This totally disregarded the conflict in the evidence.

The dissent suggests that the note and mortgage are facially clear and that no parol evidence should have been admitted which would contradict the instruments. As previously pointed out, no objections were made to the admission of the Bank's evidence in this regard. Further, the note and mortgage on their faces do not prove an obligation on the part of the Bank to deliver cash in any amount to Mr. Weaver. As an example, they would be appropriate as evidence of a debt already owed and past due. Clearly, it is necessary to go outside the terms of the instruments to determine what amount, if any, Mr. Weaver was entitled to apply on the $47,000 out-of-trust obligation to IH.

We hold that special interrogatory #1 was fatally deficient, and we remand for a new trial. For the guidance of court and counsel on remand, we will briefly consider the other issues raised on appeal.

## II

Did the District Court err in the manner in which it submitted the issue of tortious interference with contract to the jury?

8

Over the Bank's objection, the court instructed the jury that:

> The elements of interference with contract are that (1) there be a valid business relationship or reasonable expectation of economic advantage, (2) knowledge of the relationship on the part of the party interfering, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, (4) resultant damage.

The Bank contends that this instruction omits the element of unjustifiability or impropriety of the alleged tortious actions.

In Bolz v. Myers (Mont. 1982), 651 P.2d 606, 611, 39 St.Rep. 1747, 1752, this Court set forth the elements of interference with contract:

> In order to establish a prima facie case of interference with contractual or business relations, it must be shown that the acts (1) were intentional and willful, (2) were calculated to cause damage to the plaintiff in his or her business, (3) were done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor, and (4) that actual damage and loss resulted. Bermil Corp. v. Sawyer (Fla.App. 3rd Cir. 1977), 353 So.2d 579.

The instruction given to the jury omits the requirement that the act is done "without right or justifiable cause on the part of the actor." The instruction given ignores the Bank's position that its refusal of the $47,000 loan, which led to the termination of the IH franchise, was not tortious because the refusal was justified and within the Bank's rights. We conclude that an instruction on interference with contract must provide that the act is "without right or justifiable cause on the part of the actor."

9

## III a.

Did the District Court err in entering judgment upon the special verdict by entering judgment on the jury's findings of damages both for breach of contract and for tort?

In addition to the special interrogatory mentioned in Issue I, the jury considered special interrogatories on several tort and statutory claims. The jury found that the Bank did not breach a duty of good faith and fair dealing to the defendants when it refused to advance $47,000. It found that the Bank did intentionally and wrongfully interfere with the franchise contract between Weaver-Maxwell and IH; that the Bank committed fraud, deceit, or constructive fraud causing Weaver-Maxwell loss of the IH franchise; that the Bank made negligent misrepresentations causing the loss of the franchise; and that the Bank liquidated Weaver assets in bad faith. The jury set the amount of damages to Weaver-Maxwell for the tort causes of action at $800,000. Under the contract theory, the jury found that damages to Weaver-Maxwell were $300,000. The Bank's position is that $800,000 should be awarded as the larger of the alternative damage findings. However, the District Court found that the contract and tort damages were cumulative.

We conclude that the jury's verdict on the tort claims is unclear because the special interrogatories do not state which acts of the Bank were considered under each theory. The instructions should be revised on remand to show which acts of the Bank should be considered under each theory. Then it can be determined which tort damages are cumulative to contract damages and which are alternative.

III b.

Did the District Court err in entering judgment upon the special verdict because the special verdict's award of punitive damages conflicted with the jury's finding that the Bank had acted in good faith?

The jury found that the Bank did not breach its duty to act in good faith and deal fairly when it refused to advance $47,000 to the Weavers, but it did find that the Bank committed other torts - interference with contract, fraud, negligent misrepresentation, and bad faith in liquidating the Weavers' collateral. Punitive damages could have been awarded under any of the tort theories presented, if the Bank was found guilty of oppression, fraud, or malice, actual or presumed. Section 27-1-221(1), MCA. The jury instructions should be revised on retrial so that the jury can state under which tort theory or theories it awards punitive damages.

IV a.

Did the District Court err in its resolution of the issues reserved for its decision, by denying the Bank's claim for a deficiency judgment?

The Bank's suit was for sums remaining due on unpaid notes after sale of the collateral, together with costs of preparing and liquidating the collateral. The District Court concluded that the Bank's "liquidation of the assets and collateral . . . was not commercially reasonable and that the Bank is not entitled to any deficiency judgment." It concluded that the Bank was not entitled to declare a default in the indebtedness of Weaver-Maxwell because the Bank had breached its loan agreement and destroyed Weaver-Maxwell's franchise. It also concluded that because of its tortious

11

acts toward the defendants, the Bank had no right to recover the principal amounts of its loans outstanding to Weaver-Maxwell. The court concluded that the rights of the Bank to any claim for a deficiency were extinguished.

The Bank argues that neither the amount remaining owing on the loans nor the fact that it had not been paid was disputed. It asserts that it was entitled as a matter of law to a judgment for the $377,702.73 remaining due.

We conclude there is nothing in the record to justify denial of a deficiency judgment to the Bank. The court's conclusion that the liquidation of collateral was not commercially reasonable contradicts the jury's finding in special interrogatory #4b that the liquidation of the assets was commercially reasonable. Whether the Bank breached the underlying loan agreements was never an issue before the court. No cases or statutes have been cited which lead reasonably to the conclusion that the Bank's tortious conduct prohibited it from collecting on the underlying loans. In the absence of facts or legal theory beyond those in the present record, it would appear that the Bank is entitled to a deficiency judgment.

## IV b.

Did the District Court err in its resolution of the issues reserved for its decision by ordering the Bank to surrender to defendants the proceeds of liquidation of collateral?

The District Court concluded that these proceeds should be surrendered on equitable grounds. No issue was raised by the defendants and no evidence was presented on a theory that the Bank should be required to surrender the proceeds of

12

liquidation of collateral. We conclude that the jury's verdict was intended to fully compensate the defendants for tortious actions of the Bank. The record demonstrates no basis to require that the Bank surrender the proceeds.

IV c.

Did the District Court err in its resolutions of the issues reserved for its decision by awarding prejudgment interest at a rate of 18%?

The District Court awarded prejudgment interest on the $300,000 damages for breach of contract at a rate of 18%, the rate of interest on Weaver-Maxwell's loans. The Bank argues that no prejudgment interest should have been allowed because the amount of contract damages was not subject to calculation prior to judgment.

Section 27-1-211, MCA, provides:

> Right to interest. Every person who is entitled to recover damages certain or capable of being made certain by calculation and the right to recover which is vested in him upon a particular day is entitled also to recover interest thereon from that day except during such time as the debtor is pre- vented by law or by the act of the creditor from paying the debt.

The defendants argue that the amount of contract damages is reasonably certain of calculation. They assert that the amount the jury awarded represents the amount of working capital of Weaver-Maxwell. In their counterclaim, the defen- dants claimed contract damages of $2,000,000. At trial, they asked for $3,000,000. The jury awarded $300,000 in contract damages. We conclude these were not the type of damages which are "certain or capable of being made certain by calcu- lation," and that therefore prejudgment interest is not

13

available.  See Swenson v. Buffalo Bldg. Co. (Mont. 1981), 635 P.2d 978, 985, 38 St.Rep. 1588, 1597.

## IV d.

Did the District Court err in its resolutions of the issues reserved for its decision by basing an award of attorney fees to defendants on their recovery on both their contract and tort claims?

The parties' loan contracts provided for reasonable attorney fees in actions for their enforcement.  Section 28-3-704, MCA, makes the right to attorney fees reciprocal. The District Court awarded defendants attorney fees of $384,000, or 30% of the total amount awarded by the jury.

Attorney fees are awardable only where statute or contract provides for their recovery.  Sliters v. Lee (1982), 197 Mont. 182, 641 P.2d 475.  In a lawsuit involving multiple claims or multiple theories, an award of attorney fees must be based on the time spent by the prevailing party's attorney on the claim or theory under which attorney fees are allowable.  Kadillak v. Montana Dept. of State Lands (1982), 198 Mont. 70, 74, 643 P.2d 1178, 1181.  We conclude that in this case, attorney fees are awardable only on the contract claim.

Reversed and remanded.

_____
Justice

We Concur:

_____
Chief Justice

_____

14

L. C. Gulbrandson,

_____

_____

_____
Justices

Mr. Justice Frank B. Morrison dissents as follows:

It seems to me the majority opinion incorrectly decides all of the jury issues in this case.

The jury in this case was submitted special interrogatories with respect to various damage issues presented by way of counter-claim on the part of defendants. Plaintiff's foreclosure issues were reserved by the parties for decision through bench determination.

Assuming arguendo that the District Court erred in instructing the jury on the breach of contract action, then that special interrogatory to the jury should be set aside. However, such a finding does not infiltrate the tort case. Compensatory damages and punitive damages awarded by the jury should be affirmed and entry of judgment directed on those amounts totalling $980,000.

In any event, the majority incorrectly decides the breach of contract issue and that too should be affirmed. The crux of majority's position relies upon an assumption that bank officials could create a breach of contract issue by testifying the loan was for specific purposes. These purposes were from parol evidence in the form of scratch pad notations and verbal testimony. This evidence should have been excluded from the jury as it violated the parol evidence rule.

Section 28-2-904, MCA, provides as follows:

Effective written contract on oral agreements. The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.

The note and mortgage here at issue appear to be facially clear. The only exceptions, under these

16

circumstances, to the parol evidence rule are stated in § 28-2-905(1), MCA, which provides:

> When extrisic evidence concerning a written agreement may be considered.
> (1) Whenever the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms. Therefore, there can be between the parties and their representatives or successors in interest no evidence of the terms of the agreement other than the contents of the writing except in the following cases:
> (a) when a mistake or imperfection of the writing is put in issue by the pleadings;
> (b) when the validity of the agreement is the fact in dispute.

Neither of the two conditions set forth in § 28-2-905(1), MCA, is present in this case. Even if there were an ambiguity in the instruments, the Bank, having drafted the same, could not raise the ambiguity to allow for the introduction of parol evidence. Section 28-3-206, MCA, provides:

> Uncertainty to be resolved against party causing it. In cases of uncertainty not removed by parts 1 through 5 of this chapter, language of a contract should be interpreted most strongly against the party who caused the uncertainly to exist. The promissor is presumed to be such party, except that in the case of a contract between a public officer or body, as such, and a private party, it is presumed that all uncertainty was caused by the private party.

Furthermore, the intention of the parties with respect to the note and mortgage must be ascertained only from the instruments themselves unless such intention is impossible to ascertain by reference to the agreements. Section 28-3-303, MCA. The majority opinion reverses court's Instruction No. 1 by simply stating that there was a conflict in the evidence. There was in fact no conflict. Although plaintiff did not object to introduction of the parol evidence the trial court was perfectly justified, after hearing all evidence, to rule

17

that such evidence could create no fact issue on the contract obligation to pay the $84,291.69.

The majority seems to feel the note and security agreement are not a complete contract and the parole evidence rule has no application. There is abundant authority that the parol evidence rule applies to negotiable instruments. In Perez-Lizano v. Ayers (Mont. 1985), 695 P.2d 467, 42 St.Rep. 208, a similar issue was before the court. Ayers contended on appeal that his note to Perez-Lizano was conditioned by oral agreement. This Court held such representations violated the parol evidence rule. Lest there be any doubt that the rule applies to notes, this Court said:

> Section 28-2-905, MCA, provides that when the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all the terms, and there can be no evidence of the terms of the agreement other than the contents of the writing except when a mistake or an imperfection of the writing, is at issue, or when the validity of the agreement is the fact in dispute.
>
> . . .
>
> Summary judgment in this case was proper. Ayers' assertion that there is a material question of fact about the fraudulent purpose of the contract is immaterial because even if his assertions are true, the extrinsic evidence would be inadmissible under the parol evidence rule.

Numerous cases hold that a negotiable instrument which is clear on its face cannot be altered by parol agreements or representations. See Evenson v. Hlebechuk (N.D. 1981), 305 N.W.2d 13; Daniell Motor Co. Inc. v. Northwest Bank (Tex.App. 1986), 713 S.W.2d 808.

Instruction No. 1, given by the trial court, was proper because the instruments at issue were clear on their face. Upon demand by defendants, the Bank had an affirmative duty

18

to pay that which they were obligated to pay. When the Bank refused, it breached its contract to defendants.

The balance of the majority's position with respect to the jury verdict appears to be a cumulation of afterthoughts which would not have required reversal of the damage portion of the case. However, the majority is wrong on all counts.

The instruction on intentional interference is a correct one. The record supports separate damages for breach of contract and for tort. There is no indication that these damages duplicate or overlap. There is no legal requirement for the jury to be instructed that punitive damages relate to the contract or tort portion of the case. They were properly instructed that punitive damages are awarded for oppression, fraud or malice. Having found compensatory damages in tort, the jury was entitled to award punitive damages. The majority simply fails to adequately address or understand the issues in this case.

Next, the majority addresses whether the court erred in entering a judgment for defendants denying the Bank a deficiency judgment. The majority finds fault with the trial court's determination that liquidation was not commercially reasonable by boldly stating there was nothing in the record to justify such a finding and that, in any event, it contradicts the special finding of the jury.

Obviously the jury was entitled to choose from alternative theories and chose fraud instead of other theories given to them. This is perfectly permissible and is so well established a citation of authority is unnecessary.

Foreclosure issues were, by stipulation, reserved for the court. The court specifically found that the method of

liquidation was commercially unreasonable. This fact was properly decided by the court in its portion of the case.

The trial court found that Weaver-Maxwell, was not in default on the loans at issue on April 7, 1980. Only after the Bank's tortious conduct caused Weaver-Maxwell to lose its franchises did the Bank seize upon these same losses to deem itself insecure. Consequently, in the foreclosure action, the court found the Bank's reason for accelerating the loans to be commercially unreasonable. Abundant evidence in the record supported this finding.

Even if there had been a default on the part of Weaver-Maxwell, the trial court was justified in finding that liquidation was not commercially reasonable. As a part of its burden, the secured party must establish that it realized the full value of its collateral by means of a commercially reasonable disposition. Hubbard v. Farmers Bank Union Point (Ga.App. 1980), 272 S.E.2d 510, aff'd 276 S.E.2d 622 (1980). To do this, the secured party must prove the value of the collateral at the time of repossession as well as a reasonable method of sale. Wood v. First National Bank of Commerce (Ga.App. 1983), 305 S.E.2d 852. When a secured party fails to prove the value of the collateral liquidated, the law presumes the value of the collateral equaled the value of the underlying debt plus all expenses. Savoy v. Beneficial Consumer Discount Co., (Pa. 1983), 468 A.2d 465; Lincoln First Bank v. Salvaterra (1980), 431 N.Y.S.2d 302, 106 Misc.2d 51, aff'd 437 N.Y.S.2d 611, 108 Misc.2d 453 (1980); First National Bank of Denver v. Cillessen (Col.App. 1980), 622 P.2d 598.

The issue of "commercially reasonable" was for the trial court. In the absence of evidence proving that liquidation

20

was commercially reasonable the Bank should suffer by not being permitted a deficiency judgment.

At the the time it took possession of Weaver-Maxwell's assets, the Bank took no inventory of what it received. Nor did the Bank make any appraisals of the most valuable equipment or inventory. The Bank did not even keep a meaningful list of what it sold.

Based upon the evidence before it the trial court found:

> The Bank's failure to maintain an inventory of what was sold or to make any appraisals of the more valuable pieces of collateral precludes this court from determining . . . the amount of any value lost as a result of the Bank's negligence.

Finding of Fact, No. 15.

At the time of trial the Bank had collected $729,000 in liquidation proceeds against a total debt of $726,000. Actually the Bank owes defendants $3,000. All of the essential facts and applicable law are omitted in the majority's discussion.

In my opinion the trial court did err in cancelling the indebtedness and ordering return of the liquidation proceeds to defendants. This action by the court goes beyond the equitable remedies available to the judge here and may well duplicate the damages awarded by the jury. I also disagree with the trial court's determination allowing interest because the amount was not liquidated. Attorneys' fees are allowable on the contract action but not the tort action and in this respect I agree with the majority opinion.

The banking industry in Montana has complained to everyone within ear shot about obligations imposed upon the banks by this Court. At least in theory we have created

21

obligations designed to assure bank customers fair treatment when they deal with the banking industry in this state.

The facts of this case illustrate the kind of banking practices which Court-imposed obligations were designed to correct. Weavers' wished to borrow $84,291.69. The Bank wanted more security on the Weaver-Maxwell corporate debt. The Bank agreed to lend Weavers the money but demanded that Art Weaver personally collateralize the loan with a substantial portion of his family's personal assets. The Bank did not inform the Weavers that the Bank had arranged for the security on this personal note to cross-collateralize the debt of Weaver-Maxwell, Inc. After obtaining the additional security on the corporate debt, the Bank breached its contract to Weavers and failed to advance the $84,291. Instead the Bank foreclosed and liquidated the security.

There are many fine bankers and banking institutions in the State of Montana. I can personally attest to that from having done business with them. However, the kind of practice which was engaged by the Norwest Bank of Great Falls in this case should not be countenanced. It is exactly the kind of business practice which the new legal duties seek to stop.

This case represents a blatant attempt by the majority of this Court to bail the Bank out where the Bank has caused serious and irreparable damage to a Montana business and its owners. This kind of banking practice creates an unfavorable business climate in Montana and should not be shielded by the majority's result orientated judicial fiats.

There is no error in the jury trial and judgment should be entered on the jury verdict. The judgment entered by the trial court on the equity issues should be amended to reflect the views herein expressed.

_____
Justice

Mr. Justice John C. Sheehy and Mr. Justice William E. Hunt, Sr.:

We join in the dissent of Mr. Justice Morrison.

_____
John C. Sheehy

_____
William E. Hunt
Justices