DA 09-0162

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 90

IN RE THE MARRIAGE OF
AMBER E. SZAFRYK,

      Petitioner and Appellee,

  and

JOHN M. SZAFRYK,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DR 01-699
Honorable Robert L. Deschamps, III, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Ryan A. Phelan; P. Mars Scott; P. Mars Scott Law Offices; Missoula,
Montana

      For Appellee:

          Kathleen O'Rourke-Mullins; Robert A. Terrazas; Terrazas Law
Office; Missoula, Montana

Submitted on Briefs:  March 17, 2010

Decided:  April 27, 2010

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     Respondent John Szafryk (John) appeals the ruling of the District Court for the Fourth Judicial District, Missoula County, that pursuant to two divorce settlement agreements, John forfeited his right to use property owned by his ex-wife Amber Szafryk (Amber) by assigning an interest in his car dealership to a third person. John also appeals the District Court's award of rent and attorney's fees to Amber. We affirm.

¶2     We address the following issues on appeal:

¶3     1. Whether the District Court erred in concluding that John forfeited his right to use the dealership property by violating anti-assignment clauses contained in the parties' settlement agreements.

¶4     2. Whether the District Court erred in requiring John to pay rent to Amber for using her property after the date of the alleged transfer.

¶5     3. Whether the District Court erred in determining that John should pay Amber monthly rent of $2,500.

¶6     4. Whether the District Court erred in awarding Amber attorney's fees and costs.

## FACTUAL AND PROCEDURAL BACKGROUND

¶7     Amber and John married in Dillon, Montana, in 1964. In 2001 Amber petitioned to dissolve the marriage. The dissolution, Amber testified, was acrimonious. In 2003 the District Court dissolved the marriage. The decree of dissolution incorporated two settlement agreements, which divided the parties' property and debts. Amber, believing John to be in violation of the settlement agreements, initiated the present proceeding.

2

¶8      In 1983 John started an automobile dealership, Country Ford Inc. ("Country Ford" or "dealership"), in Plains, Montana.  John at all relevant times has owned all shares of Country Ford.  The dealership consisted of new- and used-car sales departments and a repair shop.  John and Amber jointly owned the land and building where Country Ford is located (dealership property).  When they divorced, John was awarded the dealership, and Amber received the dealership property.  This arrangement is the center of the present dispute.

¶9      In July 2002 the parties signed their initial settlement agreement (Settlement Agreement), which allocated the dealership property to Amber

> subject to husband[']s right to possession and use of this property as a Ford dealership (continuation of existing operation) for a maximum of 5 years. Husband[']s use right shall require husband to keep the improvements and fixtures and property in good repair, normal wear and tear excepted and capital improvements excepted.  Husband shall pay all taxes, SIDS or other assessments during his period of use.   Husband shall pay all costs of insurance (at current levels).   Should husband sell, assign, transfer or otherwise divest himself of his dealership his use right shall terminate without compensation or abatement.

The Settlement Agreement allocated the dealership to John.  The Settlement Agreement contains a provision for attorney's fees:  "Should either party be required to enforce the terms of this agreement, the prevailing party shall be entitled to his or her attorney[']s fees and costs incurred in such enforcement action."

¶10     Apparently dissatisfied with the Settlement Agreement, the parties agreed to an addendum (Addendum) a year later.  The Addendum dealt mainly with the dealership and the dealership property.  It reads in part:

3

> On page 3 of the Settlement Agreement, it was agreed that husband would be entitled to possession and use of the property as a Ford dealership for a maximum of five (5) years. The parties have agreed to modify this understanding and provide husband and his company, Country Ford, Inc., with the right to possess and use the property, rent free, through the 24th day of July, 2008. No rent or other consideration is to be paid to wife or her assignee or successor in interest for husband's possession or use except as provided herein. Such lease relationship is subject to the following terms:
>
> Any additional terms set forth in the original Settlement Agreement dated July 24, 2002.
>
> .   .   .   .
>
> The commitment set forth herein is non-assignable and personal to husband. If husband sells his interest in Country Ford, Inc., in whole or in part, or if he sells all of the assets of Country Ford, Inc., or otherwise ceases to continue the existing businesses, the operation of the Ford dealership and the used car dealership, the lease relationship shall immediately terminate.

The Addendum also provided for attorney's fees: "To the extent that the wife finds it necessary to retain an attorney to assist her in the enforcement of the terms and conditions of the agreement (lease), then husband agrees to reimburse wife for said attorney's fees at the hourly rate of $175.00 per hour." The present question is whether John violated the anti-assignment clauses of the Settlement Agreement and Addendum.

¶11 Prompted by a series of events occurring in early 2006, Amber moved the District Court to order John to remove Country Ford from her property for violating the anti-assignment provisions of the Settlement Agreement and Addendum (collectively, "settlement agreements"). The standing master assigned to the case held a hearing in October 2007, and the parties and witnesses presented testimony. While only a partial

4

transcript of this hearing (which includes none of the exhibits admitted) has been presented to this Court, the dispositive facts are undisputed.

¶12 In November 2005 John and Wade Rehbein (Wade) began discussing the possibility of Wade's purchasing Country Ford. Wade owned Outback Automotive Company (Outback Automotive), an automobile repair business in Plains. Upon John's suggestion, Wade asked Amber about leasing or purchasing the property. Amber allowed Wade to inspect the dealership building. Amber consulted other renters in Plains to determine an appropriate rent. She offered to rent the property to Wade for $3,300 per month, then lowered the offer to $2,500. Since Wade stated that he could only afford $1,000 per month, they did not reach a rental agreement. Wade then offered to buy the dealership property, but he and Amber again failed to reach an agreement.

¶13 In March 2006 Wade contacted Ford Motor Company (Ford) about acquiring the Country Ford franchise. He was advised that Ford required applicants to have two years of experience as a general manager. Wade could not meet this prerequisite. Undeterred by these setbacks, Wade hired an attorney to draft an asset purchase agreement (Asset Purchase Agreement). Under this agreement, Wade would buy the dealership for approximately $180,000, and the sale would close in July 2008 (conveniently, the same date that John's rent-free lease with Amber would end).

¶14 In the meantime, Wade would work as the general manager of Country Ford, gaining the experience necessary to acquire the franchise from Ford. The Asset Purchase Agreement provided that Wade would move the employees and equipment of Outback

5

Automotive into the Country Ford building, leasing both to Country Ford in exchange for one-hundred percent of Country Ford's profits. The sale was to be contingent on various conditions, including that Wade acquire the franchise from Ford and that Wade, as general manager of the dealership, not be fired by John. Though the agreement was originally dated May 2006, Wade and John did not sign the agreement until over a year later, after the current proceedings began.

¶15 Coincidentally, in the spring of 2006 the mechanics who worked in the repair shop at Country Ford quit. Shortly thereafter Outback Automotive moved into the dealership building. Wade financed a number of modifications of and improvements to the dealership building to accommodate his mechanics and equipment. In June 2006 Country Ford hired Wade to serve as the general manager of the dealership. As general manager, Wade earned a monthly salary of $4,500 and received one-hundred percent of Country Ford's profits. Wade would work twelve-hour days at the dealership, overseeing day-to-day operations. John decreased his time there to only a few hours each week. Wade also paid John $40,000 for what he and John described as an earnest money down payment towards the purchase of Country Ford. Still, John remained the sole stockholder in Country Ford, at no time transferring stock to Wade. At the hearing, both John and Wade testified that Wade was only the general manager of Country Ford, not an owner.

¶16 Following the hearing, the standing master issued findings of fact and conclusions of law and an order. The standing master concluded, "By transferring control, management and profits of Country Ford Inc., to Wade, John sold, transferred or assigned

6

his interest in the Country Ford, Inc., to Wade within the meaning of the Settlement Agreement and Addendum as of June 19, 2006." Consequently, the standing master reasoned, John's right to use the property terminated. The standing master ordered John to pay Amber rent of $2,500 per month from June 19, 2006, through July 24, 2008. Finally, pursuant to the settlement agreements, the standing master awarded Amber attorney's fees and costs. The District Court adopted the standing master's findings of fact, conclusions of law, and order.

¶17 John appeals.

## STANDARD OF REVIEW

¶18 The District Court's order adopted the findings of fact and conclusions of law of the standing master. We review findings of fact for clear error. *Leichtfuss v. Dabney*, 2005 MT 271, ¶ 20, 329 Mont. 129, 122 P.3d 1220. Under this deferential standard of review, we will reverse a district court if its findings of fact are not based on substantial evidence, if the district court has misapprehended the effect of the evidence, or if our review of the record leaves us with "the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Interstate Prod. Credit Assn. of Great Falls v. DeSaye*, 250 Mont. 320, 323, 820 P.2d 1285, 1287 (1991)). We review conclusions of law de novo, according no deference to the district court. *Id.* at ¶ 21. We will uphold a district court's decision that reaches the correct result, though for the wrong reason. *Wells Fargo Bank v. Talmage*, 2007 MT 45, ¶ 23, 336 Mont. 125, 152 P.3d 1275.

7

¶19    We generally review awards of attorney's fees for abuse of discretion. *Mungas v. Great Falls Clinic, LLP*, 2009 MT 426, ¶ 42, 354 Mont. 50, 221 P.3d 1230.  However, when contractual language requires an award of attorney's fees and the contract is conscionable, a district court lacks discretion to deny attorney's fees. *In re Marriage of Caras*, 263 Mont. 377, 385, 868 P.2d 615, 620 (1994).  We review a district court's construction and interpretation of a contract de novo. *Kruer v. Three Creeks Ranch of Wyo., L.L.C.*, 2008 MT 315, ¶ 37, 346 Mont. 66, 194 P.3d 634.

**DISCUSSION**

¶20    ***Issue 1:  Whether the District Court erred in concluding that John forfeited his right to use the dealership property by violating anti-assignment clauses contained in the parties' settlement agreements.***

¶21    The District Court determined that John and Wade's business relationship was too "convenient"—so convenient that it violated the anti-assignment provisions of the settlement agreements.  John contends that since he retained all the dealership stock and that the dealership sale was not scheduled to close until 2008, the District Court's conclusion was in error.  We agree with the District Court.

¶22    The business relationship between John and Wade likely established a partnership in fact. *See MacArthur Co. v. Stein*, 282 Mont. 85, 88-92, 934 P.2d 214, 216-19 (1997) (presenting and applying test to determine whether a partnership formed).  The evidence may also be sufficient to establish Wade as a shareholder of Country Ford, even though he did not formally purchase stock. *See Bump v. Stewart, Wimer & Bump, P.C.*, 336 N.W.2d 731, 735-36 (Iowa 1983) (finding third parties to be shareholders in professional

8

corporation even though they were not formally issued stock); *cf. Hanson Sheep Co. v. Farmers & Traders' St. Bank*, 53 Mont. 324, 338-39, 163 P. 1151, 1155 (1917) (looking past ownership of stock to find third party's "position as stockholder was only nominal"). Neither the parties nor the District Court attempted to complete this portion of the John-Wade-business-relationship jigsaw puzzle. Nevertheless, the language of the settlement agreements is sufficient to resolve this issue.

¶23 Construction and interpretation of the settlement agreements is a question of law. *Edwards v. Cascade Co. Sheriff's Dept.*, 2009 MT 451, ¶ 38, 354 Mont. 307, 223 P.3d 893. The Settlement Agreement allocated the dealership property to Amber, but allowed John to use it to run the dealership for five years, a right which would terminate should John "sell, assign, transfer or otherwise divest himself of his dealership." The Addendum clarified this relationship by granting John a rent-free lease of the dealership property until July 24, 2008, to run the dealership. Again this right to use the dealership property was subject to an anti-assignment provision that would terminate the lease if John "sells his interest in Country Ford, Inc., in whole or part, . . . or otherwise ceases to continue the existing businesses." The lease in the Addendum remained subject to the "additional terms set forth in the original Settlement Agreement." The apparent purpose of these provisions was to allow John to operate the dealership to earn his livelihood, but allow Amber to use the property for her own advantage (through rent or sale) if John ceased operating the businesses. This purpose is reflected in the catchall phrases in the

9

Settlement Agreement ("or otherwise divest himself of his dealership") and in the Addendum ("or otherwise ceases to continue the existing businesses").

¶24 Here, the District Court did not err in concluding that John's right to use the dealership property terminated. While the District Court focused on the "sell, assign, [or] transfer" language from the Settlement Agreement, we conclude that the clause "otherwise ceases to continue the existing businesses" from the Addendum is dispositive. The intention of the settlement agreements was to allow John, personally, to earn profits from the dealership without having to pay rent to Amber. John did not formally sell shares in the dealership to Wade. However, John transferred his right to use the dealership property rent-free to Wade. John "otherwise cease[d] to continue the existing businesses" by allowing Wade to assume management and control of the dealership, receive all profits from the dealership, move his repair business (Outback Automotive) onto the dealership property, and finance modifications to the dealership building. Effectively, John used his free-rent arrangement from the settlement agreements as a bargaining chip to negotiate the sale to Wade. Assuming that $2,500 was a reasonable monthly rent for use of the dealership, Wade stood to save $60,000, not an insignificant sum, by taking over the remaining period of John's rent-free lease of the dealership property. However, because John's right to use the property without paying rent was personal to him, he could not transfer it to Wade. By doing so, John forfeited his right to use the dealership property.

10

¶25    John argues that he did not transfer any interest in the dealership to Wade because he did not sell him any stock in Country Ford.  This argument is an attempt to elevate form over substance.  *See* § 1-3-219, MCA ("The law respects form less than substance.").  Further, because we conclude that operation of the dealership is the dispositive issue, whether John formally transferred his stock in Country Ford to Wade is immaterial.  For these same reasons, John's arguments that he did not transfer his interest in the dealership because of the Asset Purchase Agreement and because of Wade's inability to meet statutory requirements are also without merit.

¶26    John also argues that the District Court erred by concluding generally that he "sold, transferred or assigned his interest" in Country Ford.  Citing *Ballenger v. Tillman*, 133 Mont. 369, 324 P.2d 1045 (1958), John asserts that the District Court should have specified whether he sold or transferred or assigned his interest in the dealership.  Because we conclude that John forfeited his right to use the dealership property by ceasing to personally operate Country Ford, we need not address this argument.  Even assuming that the District Court erroneously concluded that John transferred an interest in Country Ford, it still reached the correct result (that John forfeited his use right).  *Wells Fargo Bank v. Talmage*, 2007 MT 45, ¶ 23, 336 Mont. 125, 152 P.3d 1275.

¶27    ***Issue 2:  Whether the District Court erred in requiring John to pay rent to Amber for using her property after the date of the alleged transfer.***

¶28    John next argues that the District Court erred in requiring him to pay rent to Amber from June 2006 through July 2008.  John argues that if he transferred his interest in the dealership, he should not be liable for the dealership's rent.

11

¶29 John's argument misstates the District Court's conclusion. The District Court did not conclude that John had transferred all of his interest in Country Ford. Furthermore, the testimony presented indicated that John retained some vestigial interest in the dealership: he retained nominal ownership of stock and, ostensibly, the ability to fire Wade.

¶30 Here, John's actions violated the settlement agreements. For such breach of contract, the appropriate remedy is damages in an amount "which will compensate the party aggrieved for all the detriment which was proximately caused thereby." Section 27-1-311, MCA. John's breach of the settlement agreements prevented Amber from earning a reasonable rent for the use of the dealership property. Accordingly, the District Court did not err in requiring John to pay Amber rent for using the dealership property after June 2006.

¶31 ***Issue 3: Whether the District Court erred in determining that John should pay Amber monthly rent of $2,500.***

¶32 Next, John contends that the District Court factually erred in finding that $2,500 was a reasonable rental value. John asserts that this finding was not supported by substantial evidence.

¶33 At the hearing, Amber presented uncontradicted testimony that she consulted various renters in Plains to determine the rental value of the dealership. She testified that the monthly market rental value of the dealership would be $4,000 and that she originally offered to rent the dealership to Wade for $3,300 per month. Eventually, she offered to rent the dealership to Wade for $2,500 per month, but Wade refused. John presented no

12

similar estimate of the rental value of the dealership. Accordingly, we conclude that substantial evidence supported the District Court's finding that $2,500 was a reasonable monthly rent.

¶34 ***Issue 4: Whether the District Court erred in awarding Amber attorney's fees and costs.***

¶35 Finally, John argues conditionally that pursuant to the settlement agreements and § 28-3-704, MCA, Amber should not be entitled to attorney's fees unless she prevails in all aspects of her case. Because Amber has prevailed in all aspects of her case, an award of attorney's fees is appropriate.

¶36 Affirmed.


/S/ W. WILLIAM LEAPHART


We concur:


/S/ BRIAN MORRIS
/S/ PATRICIA O. COTTER
/S/ MICHAEL E WHEAT
/S/ JIM RICE

13