
DA 09-0487

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 167

VALERIE EMMERSON,

      Petitioner and Appellant,

  v.

WALLACE C. WALKER and RANA RAE WALKER,

      Respondents and Appellees.

_____

WALLACE C. WALKER and RANA RAE WALKER,

      Third-Party Plaintiffs, Appellees, and Cross-Appellants,

  v.

S. TUCKER JOHNSON,

      Third-Party Defendant and Appellant.

APPEAL FROM:    District Court of the Sixth Judicial District,
                In and For the County of Sweet Grass, Cause No. DV 07-8
                Honorable Wm. Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            James H. Goetz and Bonnie L. Jarrett; Goetz, Gallik & Baldwin, P.C.;
            Bozeman, Montana (S. Tucker Johnson)

            Karl Knuchel, Attorney at Law; Livingston, Montana (Valerie Emmerson)

      For Appellees:

            Leanne M. Schraudner; Schraudner & Hillier, PLLC; Bozeman, Montana

Submitted on Briefs:  May 12, 2010

Decided:  July 28, 2010

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     S. Tucker Johnson appeals from the order and judgment entered by the Sixth Judicial District Court, Sweet Grass County, concluding he tortiously interfered with a contract for the exchange of property between Valerie Emmerson and Wallace and Rana Rae Walker.  Emmerson appeals from the District Court's award of attorney fees to Walkers.   Walkers cross-appeal the District Court's denial of punitive damages they sought against Johnson.  We affirm.

¶2     We state Johnson's and Emmerson's issues as follows:

¶3     *1.  Did the District Court err by concluding that Johnson's actions constituted tortious interference with a contract between Emmerson and Walkers?*

¶4     *2.  Did the District Court abuse its discretion in determining Walkers' attorney fee award?*

¶5     Walkers raise the following issue on cross-appeal:

¶6     *3.  Did the District Court err by failing to award punitive damages to Walkers?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶7     Wallace Walker is a physician who resides with his wife, Rana Rae, and children near Big Timber.  The Walker family shares a passion for ranching and, in January of 2000, purchased a 739-acre property located roughly seventeen miles outside of Big Timber for $325,000.  At the time, Wallace worked for the IHS Hospital serving Crow Agency and Havre.

¶8     Wallace served in the military reserves and, in 2003, served a one-year deployment in Iraq.  Upon his return, Wallace obtained employment with the Big Timber

3

hospital, where he was required to be on call and to reach the hospital within fifteen minutes. Because Wallace was unable to do so from their ranch, Walkers listed the property for sale at $695,000 and began looking for another ranch property within a fifteen-minute drive to town.

¶9 Emmerson was then attempting to sell her 480-acre ranch property, located within a fifteen-minute drive of Big Timber. Walkers inquired whether Emmerson was interested in a like-kind exchange of their respective properties, pursuant to 26 U.S.C. § 1031. Although not initially interested, Emmerson changed her mind after hearing from a friend about the attributes of Walkers' property, and the parties entered an exchange agreement on May 15, 2006, agreeing to convey their respective properties to each other. The agreement was made contingent upon Emmerson fencing her property and obtaining an access easement which would permit at least one homesite thereon, but Walkers could nevertheless, in their discretion, enforce the agreement should they "desire to proceed," even if Emmerson failed to satisfy the conditions. Walkers paid their realtor $10,000 and took their property off the market. Emmerson asked Walkers if she could begin using their property while they were waiting for the exchange to be completed, to which Walkers agreed. Emmerson began to do so, and she changed the utility service from Walkers' name to her own.

¶10 In October of 2006, Johnson came to Montana to look for real estate to purchase. During a drive through the area, Johnson saw a "For Sale" sign on Susan Newhall's property, adjacent to Emmerson's property. Returning with a real estate agent to view

4

Newhall's property, Johnson inquired about purchasing Emmerson's property. Johnson intended on buying numerous parcels, testifying at trial that he "even fantasized about making purchases that could lead all the way up to the base of the Crazies." Johnson indicated to his real estate agent that he would make an offer both on Newhall's property and an offer of $800,000 on Emmerson's property, $105,000 more than the estimated value Emmerson would receive under the exchange agreement with Walkers. Johnson conditioned his purchase of Newhall's property upon his obtaining of Emmerson's property as well.

¶11 On October 27, 2006, Emmerson was informed of Johnson's offer. During her discussions with Newhall's realtor and Johnson, Emmerson disclosed her exchange agreement with Walkers. Emmerson called Walkers and advised them she had received a "better offer" and wanted out of their agreement. Walkers were upset and attempted to contact their attorney, Mark Josephson, who was out of town. Later, Newhall's realtor inquired of Josephson whether Walkers would be willing to forgo their exchange agreement with Emmerson. Emmerson's attorney, Jane Mersen, called Josephson indicating that Emmerson was interested in an "efficiency breach" of the exchange agreement and wanted to know how much in damages Walkers would take to terminate the agreement. In response to these inquiries, Josephson explained that Walkers were happy with the agreement.

¶12 The District Court found that, on November 15, 2006, following multiple contacts between Josephson and Johnson's and Newhall's real estate agents, and noting Johnson

5

had been kept fully informed, Johnson directly contacted Josephson and asked Josephson to represent him. Josephson declined and advised Johnson that the Emmerson-Walker agreement was binding and Walkers intended to close.

¶13 Because of these contacts, Josephson sent a letter on November 27, 2006, to Mersen, Emmerson's attorney, conveying Walkers' intention to close on the agreement and seeking assurances the transaction would proceed as agreed:

> If we do not hear from you by 5:00 p.m., Monday, December 4th, we will assume that Ms. Emmerson does indeed intend to continue pursuing the easement application and to honor her obligations under the exchange contract by completing the exchange with Walkers. If Ms. Emmerson's intentions are to not honor the exchange contract, then please notify us by 5:00 p.m., December 4th, 2006.

Neither Emmerson nor Emmerson's attorney offered any response by the stated deadline.[1]

¶14 In mid-December 2006, Johnson made a second round of offers on Newhall's and Emmerson's properties, again made contingent upon the closing of the other. In the new offer to Emmerson, Johnson increased the amount offered by $30,000, or $135,000 more than the anticipated value Emmerson would receive under the exchange agreement with Walkers. Johnson had his attorney, Karl Knuchel, write to Emmerson's attorney, Mersen, suggesting that the agreement between Emmerson and Walkers was voidable. When Mersen disagreed, Johnson suggested to Emmerson that she obtain opinions from other lawyers. Johnson provided Emmerson with a list of attorneys to consult, and after

---

[1] Josephson subsequently sent another letter to Mersen expressing Walkers' election to close without satisfaction of the contract contingencies by Emmerson, in accordance with the contract.

Emmerson spoke with a different attorney who opined that the exchange agreement with Walkers was valid, Johnson continued to encourage Emmerson to forgo closing on the agreement.

¶15    On January 5, 2007, an offer to purchase Walkers' property for $695,000, their original, full asking price, was conveyed to Walkers through Sonny Todd Realty, which had received the offer from the same real estate agent representing Johnson. The offer was made by an entity named Open Range LLC and Johnson's involvement was not disclosed. This offer provided that Walkers' property was to be purchased with cash and that the buyer reserved the right to facilitate a 1031 exchange. Walkers responded by contacting Emmerson to inquire whether she would be willing to sell her property for cash. Emmerson seemed unsurprised by the inquiry and immediately rejected it. Walkers then refused the offer from Open Range LLC. It was not until this litigation commenced that Walkers learned Johnson was behind the offer and had created Open Range LLC to act as his buyer. On January 10, 2007, Johnson entered an exchange agreement with Emmerson, promising that he "would acquire" Walkers' property, exchange the property for Emmerson's property, and pay Emmerson $135,000 in boot.[2]

¶16    After Johnson's attempt to secretly purchase Walkers' property failed, Emmerson signed a waiver of conflict of interest permitting Johnson's attorney, Knuchel, to represent her. On February 23, 2007, Knuchel wrote to Josephson on Emmerson's

_____

[2] "If one party to a like-kind exchange also contributes some other property, then that property is called 'boot.'" *Drayton v. U.S.*, 801 F.2d 117, 126 n. 7 (3d Cir. 1986).

7

behalf, advising that "by this letter . . . Val Emmerson repudiates the 'Exchange Agreement' and considers it to be null and void." Johnson had Emmerson, represented now by Karl Knuchel, initiate a declaratory action against Walkers seeking to invalidate the Emmerson-Walker exchange agreement, which was filed on February 28, 2007. For her part, Emmerson testified that she did "not want the legal responsibility" for the lawsuit and that she may not have filed the suit if she would have been obligated to pay her attorney fees. Johnson bore these fees.

¶17 Walkers, represented in the litigation by Leanne M. Schraudner, answered by asking that the court declare the exchange agreement valid and Emmerson be ordered to specifically perform. They also filed a third-party claim against Johnson, alleging tortious interference with a contract and intentional and negligent infliction of emotional distress. Johnson, represented in litigation by Mark J. Hartwig, counterclaimed against Walkers, alleging tortious interference with a contract and abuse of process, and sought sanctions under Rule 11 of the Montana Rules of Civil Procedure. Johnson claimed $50,000 for emotional damages caused by this litigation delaying the building of his Montana vacation home and the travel costs for private jet transportation to Montana to respond to this suit.[3]

¶18 After a bench trial, the District Court entered an order in May 2009 holding the exchange agreement between Emmerson and Walkers was valid and enforceable, and commenting that Emmerson's case "barely survived [Walkers'] motion for summary

---

[3] During cross-examination at trial, Johnson withdrew his request for these costs.

8

judgment." The District Court ordered Emmerson to specifically perform by closing on the agreement in no less than thirty days. The District Court concluded that Johnson had tortiously interfered with Walkers' contract and awarded them emotional distress damages against Johnson in the amount of $150,000. The District Court did not award punitive damages to Walkers. Subsequently, the District Court awarded attorney fees and costs to Walkers pursuant to the terms of the exchange agreement with Emmerson. The District Court subtracted only $3,000 of the total fees as the portion solely associated with the Johnson litigation, and not subject to a fee award, noting that "Emmerson's [own] expert, Kevin Brown, admitted that he could not segregate the Walkers' attorney fees between the Johnson and Emmerson claims." Walkers were therefore awarded attorney fees of $35,505.95. Johnson's counterclaims were dismissed.

¶19 Johnson and Emmerson appeal, and Walkers cross-appeal.

## STANDARD OF REVIEW

¶20 We review a district court's findings of fact to determine whether they are clearly erroneous. *Baltrusch v. Baltrusch*, 2003 MT 357, ¶ 23, 319 Mont. 23, 83 P.3d 256. We review a district court's conclusions of law de novo for correctness. *Hidden Hollow Ranch v. Fields*, 2004 MT 153, ¶ 21, 321 Mont. 505, 92 P.3d 1185. We exercise plenary review over constitutional issues. *State v. Carter*, 2005 MT 87, ¶ 21, 326 Mont. 427, 114 P.3d 1001. We generally review an award of attorney fees for an abuse of discretion. *Glaspey v. Workman*, 234 Mont. 374, 377, 763 P.2d 666, 668 (1988); *Tacke v. Energy West, Inc.*, 2010 MT 39, ¶ 17, 355 Mont. 243, 227 P.3d 601. However, when a contract

9

"requires an award of attorney's fees and the contract is conscionable, a district court lacks discretion to deny attorney's fees." *In re Szafryk*, 2010 MT 90, ¶ 19, 356 Mont. 141, 232 P.3d 361.

## DISCUSSION

**¶21** ***1. Did the District Court err by concluding that Johnson's actions constituted tortious interference with a contract between Emmerson and Walkers?***

**¶22** Johnson argues that his conduct does not amount to tortious interference with a contract because he, "at most, simply induced Emmerson to seek a court remedy," and thus exercise her constitutional and statutory right to petition the court for a declaratory judgment. He explains he is raising "[o]nly questions of law"—that the District Court erred by failing to recognize the constitutional right to seek redress of grievances within its analysis concluding he committed tortious interference. Walkers respond that Johnson raises new issues on appeal and that Johnson has offered "a whitewash of the facts" because he "did much more than merely promote litigation." Therefore, Walkers contend Johnson's constitutional arguments are an improper misdirection of the case.

**¶23** Johnson's arguments do contain a challenge to the District Court's conclusion that he committed tortious interference of contract, and we thus turn to an analysis of that tort. Strangers to a contract have a "duty not to interfere" with the performance of contracts between other parties. *Bolz v. Myers*, 200 Mont. 286, 293, 651 P.2d 606, 609 (1982). In order to establish a claim of tortious interference with a contract, a claimant must prove the defendant's acts:

10

1) were intentional and willful; 2) were calculated to cause damage to the plaintiff in his or her business; 3) were done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor; and 4) that actual damages and loss resulted.

*Hardy v. Vision Serv. Plan*, 2005 MT 232, ¶ 18, 328 Mont. 385, 120 P.3d 402; *see also Bolz*, 200 Mont. at 295, 651 P.2d at 611; *Hughes v. Lynch*, 2007 MT 177, ¶ 25, 338 Mont. 214, 164 P.3d 913. We have explained that this test determines whether a party's actions were "improper," a term used by the *Restatement (Second) of Torts* § 767 (1979), and that the following factors will be used to evaluate the propriety of the challenged actions:

(a) the nature of the actor's conduct,
(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference and
(g) the relations between the parties.

*Restatement (Second) of Torts* § 767.[4] *See also Bolz*, 200 Mont. at 294-95, 651 P.2d at 610-11; *Stokes v. State*, 2007 MT 169, ¶ 13, 338 Mont. 165, 162 P.3d 865; *Farrington v. Buttrey Food and Drug Stores Co.*, 272 Mont. 140, 143, 900 P.2d 277, 279 (1995).

¶24 After analyzing these standards and the evidence, the District Court concluded that Walkers had carried their burden of demonstrating that "Johnson tortiously interfered

---

[4] We have not adopted the precise language of the *Restatement*'s test for tortious interference with a contract but have nevertheless used its factors in assessing the propriety of challenged actions. *See Bolz*, 200 Mont. at 294-95, 651 P.2d at 610-11; *State Medical Oxygen and Supply, Inc. v. Am. Medical Oxygen Co.*, 267 Mont. 340, 345, 883 P.2d 1241, 1244 (1994).

with the Walker/Exchange agreement." We conclude that the District Court's conclusions were correctly entered.

¶25 Prior to Johnson's arrival, Emmerson and Walkers had entered the exchange agreement and the process of closing that agreement was proceeding as planned. Emmerson was even using Walkers' property and had changed the utilities on that property into her own name. No problems in the transaction were then apparent. Johnson then arrived and, when Walkers would not withdraw from the agreement voluntarily, he engaged in a calculated course to negate the agreement. He attempted to disrupt Walkers' relationship with their attorney, Josephson. He, in the words of the District Court's findings, "enticed" Emmerson by making offers to her which exceeded the value she would receive from her agreement with Walkers by up to $135,000, encouraged Emmerson "to forgo closing on the Walker Emmerson Exchange agreement," and promised Emmerson he "would acquire" Walkers' property and exchange it for hers. He had his attorney send a letter to Emmerson's attorney that asserted the exchange agreement between Emmerson and Walkers was voidable. When Emmerson's attorney disagreed, Johnson directed Emmerson to other legal counsel, and when that advice was contrary, Johnson had his own attorney send a letter to Walkers on behalf of Emmerson repudiating their exchange agreement. Johnson attempted to "secretly purchase" Walkers' property in an effort to remove them from the exchange agreement by offering their full asking price under the veil of an LLC he had created. When these efforts failed, Johnson had his attorney seek a judgment on behalf of

12

Emmerson declaring the exchange agreement void and underwrote the litigation costs and fees. As found by the District Court, Johnson "directed" and "orchestrated" the litigation between Emmerson and Walkers. Considered *in toto*, the factual findings of the District Court unmistakably demonstrate that Johnson's actions were improper and support the conclusion of law that the elements of tortious interference with a contract claim were established.

¶26 Johnson's appellate posture focuses on Emmerson's and Johnson's statutory and constitutional rights to seek legal redress through the courts. He argues that the District Court's "mechanical application" of the tortious interference standards was insufficiently rigorous to protect his fundamental litigation rights. Johnson argues that, absent a conclusion that Johnson initiated the lawsuit against Walkers maliciously or as an abuse of process, his right to challenge the agreement was constitutionally protected and could not provide the foundation for an interference claim.

¶27 However, Johnson's carefully crafted appellate arguments were not raised in the District Court. Johnson did not defend against Walkers' tortious interference claim by asserting that his actions were constitutionally or statutorily protected as legal redress rights. In his answer, he asserted a general denial and the affirmative defenses of "laches and collateral estoppel," "unclean hands," and "failure to state a claim for which relief can be granted." No reference is made to any constitutional or statutory redress issue in Johnson's pre-trial filings. In his proposed findings of fact and conclusions of law, Johnson analyzes the elements of tortious interference and only generally states that

13

"Johnson had the right to undertake his actions and was justified in his actions." None of these "general assertions to the trial court without any argument," *State v. Courville*, 2002 MT 330, ¶ 5, 313 Mont. 218, 61 P.3d 749, were sufficient to bring these issues to the attention of the District Court or preserve them for appeal. *State v. Adgerson*, 2003 MT 284, ¶ 12, 318 Mont. 22, 78 P.3d 850 ("[I]t is fundamentally unfair to fault the trial court for failing to rule on an issue it was never given the opportunity to consider."); *Thibodeau v. Bechtold*, 2008 MT 412, ¶ 29, 347 Mont. 277, 198 P.3d 785 (explaining that waiver promotes "judicial economy"); *State v. Ferguson*, 2005 MT 343, ¶ 38, 330 Mont. 103, 126 P.3d 463; *In re Estate of Kindsfather*, 2005 MT 51, ¶ 34, 326 Mont. 192, 108 P.3d 487; *Schaffer v. Champion Home Builders Co.*, 229 Mont. 533, 537, 747 P.2d 872, 874 (1987).

¶28 Johnson requests, alternatively, that this Court address his issues by invoking the plain error doctrine. Invoking the plain error doctrine is discretionary and requires this Court be convinced that the failure to address the issue "may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process." *State v. Taylor*, 2010 MT 94, ¶¶ 12-13, 356 Mont. 167, 231 P.3d 79; *see also State v. Finley*, 276 Mont. 126, 137, 915 P.2d 208, 215 (1996), *overruled on other grounds by State v. Gallagher*, 2001 MT 39, ¶ 21, 304 Mont. 215, 19 P.3d 817. The doctrine is invoked "sparingly" in criminal cases and "only on rare occasion" in civil cases. *State v. Price*, 2007 MT 269, ¶ 14, 339 Mont. 399, 171 P.3d 293; *Reno v. Erickstein*, 209 Mont. 36, 42,

679 P.2d 1204, 1207-08 (1984); *see also In re K.J.*, 2010 MT 41, ¶¶ 15-20, 355 Mont. 257, 231 P.3d 75; *Paulson v. Flathead Conserv. Dist.*, 2004 MT 136, ¶ 40, 321 Mont. 364, 91 P.3d 569; *Jefferson Co. v. McCauley Ranches, LLP*, 1999 MT 333, ¶¶ 16, 24-25, 297 Mont. 392, 994 P.2d 11.

¶29　We conclude Johnson has failed to meet the threshold burden demonstrating the necessity for invoking the doctrine under the above-stated standards.　The parties tried Walkers' claim upon all the defenses which Johnson raised.　He was represented by counsel during the entirety of the proceedings.　He failed to raise legal redress issues at any time and waived them.　Further, Johnson's actions in attempting to undermine the Emmerson-Walker agreement were much broader in scope than simply seeking to challenge the agreement in court.　We thus decline to invoke the plain error doctrine and affirm the District Court's conclusions of law.

¶30　***2. Did the District Court abuse its discretion in determining Walkers' attorney fee award?***

¶31　In her appeal, Emmerson argues the District Court failed to sufficiently separate the fees incurred by Walkers in prosecuting their interference claim against Johnson from the fees they incurred in defending her declaratory challenge to their agreement. Although acknowledging that their agreement obligates her to pay Walkers' contract-related attorney fees, Emmerson argues that these fees were not sufficiently identified, and therefore the award of $35,505.95 is excessive.　She requests a remand "to conduct a more accurate, reasonable, and conscientious calculation of the amount of the attorneys'

15

fees awarded." Walkers argue that most of the fees they incurred in the action were indivisible, and therefore the fee award is appropriate.

¶32 A court may award attorney fees only where a statute or a contract provides for their recovery. *Stavenjord v. Mont. State Fund*, 2006 MT 257, ¶ 21, 334 Mont. 117, 146 P.3d 724; *Northwestern Natl. Bank of Great Falls v. Weaver-Maxwell, Inc.*, 224 Mont. 33, 44, 729 P.2d 1258, 1264 (1986). "In a lawsuit involving multiple claims or multiple theories, an award of attorney fees must be based on the time spent by the prevailing party's attorney on the claim or theory under which attorney fees are allowable." *Northwestern Natl. Bank of Great Falls*, 224 Mont. at 44, 729 P.2d at 1264-65 (citing *Kadillak v. Mont. Dept. of State Lands*, 198 Mont. 70, 74, 643 P.2d 1178, 1181 (1982)). When calculating attorney fees in a case "where it is impossible to segregate the attorney's time between claims entitling the party to attorney fees and other claims," an attorney may be entitled to the "entire fee." *Blue Ridge Homes, Inc. v. Thein*, 2008 MT 264, ¶ 79, 345 Mont. 125, 191 P.3d 374; *see also Donnes v. Orlando*, 221 Mont. 356, 361-62, 720 P.2d 233, 237 (1986).

¶33 The exchange agreement between Walkers and Emmerson provided: "Should any party incur any costs or expenses, including reasonable attorney's fees, in enforcing any of the provisions of this Agreement, then the other or unsuccessful party shall reimburse the prevailing party on demand." Thus, the agreement provided attorney fees for Walkers' defense of Emmerson's action but not for prosecution of the tort claim against Johnson. The District Court allocated $3,000 of Walkers' total fees as applying

16

exclusively to the claim against Johnson but concluded the remaining fees were inextricably intertwined with both the Emmerson and Johnson matters.

¶34    At the attorney fee hearing, Leanne Schraudner testified as follows:

> As attorney for this case, the issues were so intertwined. All of the witnesses were the same, all of it arose out of the same facts, and in essence Ms. Emmerson and Mr. Johnson worked in consort. So, the only costs that I could find that were . . . solely attributable to Mr. Johnson [were] approximately 3,000.

Attorney Kevin Brown testified as an expert on behalf of Emmerson. Brown agreed that Walkers' claimed fees were reasonable and maintained that only a portion should be attributed to Emmerson, but, as found by the District Court, "admitted that he could not segregate the time between the Emmerson and Johnson claims." Emmerson cites to *Kadillak*, 198 Mont. at 75-76, 643 P.2d at 1182, where an alternative fee calculation method was employed, but it does not follow that the District Court was required to utilize a different path here. Based upon Schraudner's testimony, we conclude the District Court did not abuse its discretion in awarding fees totaling $35,505.95 against Emmerson pursuant to the parties' agreement.

¶35    Walkers request that their appellate costs and attorney fees be awarded, which Emmerson does not dispute. Walkers are awarded appellate costs and fees based upon their contract with Emmerson. *See Boyne USA, Inc. v. Lone Moose Meadows, LLC*, 2010 MT 133, ¶ 26, 356 Mont. 408, ___ P.3d ___; *Eschenbacher v. Anderson*, 2001 MT 206, ¶ 51, 306 Mont. 321, 34 P.3d 87; M. R. App. P. 19(3)(a).

17

¶36    *3. Did the District Court err by failing to award punitive damages to Walkers?*

¶37    Walkers cross-appeal the District Court's failure to award them punitive damages against Johnson in addition to the compensatory damages awarded.   Noting that the District Court ruled from the bench at the conclusion of the trial that "malice" by Johnson had not been established, Walkers argue that the court "appears to have misapprehended the law" because several of the court's findings "mirror" the statutory definition of malice for purposes of punitive damages.  Johnson responds that Walkers failed to prove malice by clear and convincing evidence because the court acknowledged that some of Johnson's actions were acceptable and that punitive damages rest within the trier of fact's discretion, which was appropriately exercised here.

¶38    Section 27-1-220(1), MCA, provides that "a judge or jury may award, in addition to compensatory damages, punitive damages for the sake of example and for the purpose of punishing a defendant."   In turn, § 27-1-221(1), MCA, provides that punitive damages "may be awarded when the defendant has been found guilty of actual fraud or actual malice."   Actual malice, upon which Walkers' claim was premised, requires that:

> [T]he defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and:
>
> (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or
>
> (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

Section 27-1-221(2), MCA.   "All elements of the claim for punitive damages must be proved by clear and convincing evidence," meaning "there is no serious or substantial

doubt about the correctness of the conclusions drawn from the evidence." Section 27-1-221(5), MCA.

¶39 We have held that "[a] district court judge, having heard the evidence and observed the witnesses, is in the best position to determine whether the requirements of proof of punitive damages have been met." *Dees v. Am. Natl. Fire Ins. Co.*, 260 Mont. 431, 446, 861 P.2d 141, 150 (1993). Here, the District Court determined that Walkers had "obviously" failed to prove "actual malice" by clear and convincing evidence. Walkers urge us to draw a different conclusion from several of the District Court's findings, but to do so would potentially conflict with other parts of the District Court's order. The District Court stated that determining whether Johnson was liable was "more difficult" than it was for Emmerson. The court "recognized Johnson's attempts to reach an accommodation by finding other suitable properties for Walkers and that fact reduced the Court's award of damages" against Johnson. This conclusion would weigh against a finding necessary to establish "actual malice"—that Johnson had proceeded in disregard to facts creating a high probability of injury to Walkers. If Johnson was attempting to accommodate Walkers' desires by finding another suitable property for them, as the District Court concluded, then it is conceivable that Johnson did not intend to proceed in disregard to the probability of injury to Walkers. The District Court entered no findings regarding these elements of actual malice.

¶40 Further, the statutes cited above make punitive damage awards discretionary, and it was within the purview of the District Court, as the trier of fact, to determine whether

19

punitive damages were appropriate. *Dees*, 260 Mont. at 446-47, 861 P.2d at 150 (denial of punitive damages will not be overturned "absent an abuse of discretion"); *see also Beaver v. Mont. DNRC*, 2003 MT 287, ¶ 83, 318 Mont. 35, 78 P.3d 857. Our review of the record does not lead to a conclusion that the District Court's failure to award punitive damages was an abuse of its discretion as the trier of fact.

¶41 Johnson's pending motion to strike Walkers' reply brief is denied. The District Court's judgment is affirmed.

/S/ JIM RICE

We concur:

/S/ W. WILLIAM LEAPHART
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER

Justice James C. Nelson concurs and dissents.

¶42 I concur in the Court's Opinion as to the issues on appeal; however, I dissent from the trial court's decision to deny the Walkers punitive damages. I would remand for further proceedings to determine, award, and enter judgment for punitive damages. I write separately on that point.

¶43 The trial court dismissed the Walkers' claim for punitive damages from the bench without briefing or argument on the ground that the Walkers failed to prove malice.

20

Opinion, ¶ 37. Walkers were, at the very minimum, entitled to brief and argue this contested issue. That aside, actual malice—for punitive damages purposes—is defined by § 27-1-221(2), MCA, and must be proven by clear and convincing evidence, § 27-1-221(5), MCA. Opinion, ¶ 38. Based on the facts of this case, Opinion, ¶¶ 12-17, 25, I conclude that the Walkers clearly and convincingly met their burden to prove malice under § 27-1-221(2)(a) and (b), MCA. Johnson engaged in tortious conduct which interfered with and attempted to cause Emmerson to breach her contract with the Walkers.

¶44 We have affirmed the award of punitive damages (and damages for emotional distress) in a case involving the tortious interference with the plaintiffs' right to purchase a parcel of land. *Maloney v. Home and Investment Center, Inc.*, 2000 MT 34, ¶¶ 72, 77, 298 Mont. 213, 994 P.2d 1124. Accordingly, there is ample legal authority for the Walkers' claim for punitive damages here.

¶45 Factually, as set out in the Court's Opinion, Johnson, a wealthy, self-styled "very sophisticated investor," determined to purchase the property that Emmerson had lawfully contracted to exchange with the Walkers. Over a period of months, Johnson single-mindedly orchestrated a series of acts pointedly calculated to defeat the Emmerson/Walker contract—while keeping his nefarious activities from the Walkers.

¶46 The District Court found that Johnson enticed Emmerson to ignore her contract with the Walkers by making offers to Emmerson for more money than the Emmerson/Walker contract; by entering into an exchange agreement with Emmerson; by

21

funding and directing Emmerson to file a complaint against the Walkers to invalidate the exchange agreement; by providing legal opinions to Emmerson's lawyer on how to invalidate the Emmerson/Walker agreement; by recommending lawyers to Emmerson so to pursue a complaint against the Walkers—after Emmerson's lawyer maintained that the agreement was valid; and, ultimately, by making his own lawyer available to Emmerson to file the instant suit and by paying the attorneys' fees and costs of the litigation.[1] Johnson threatened the Walkers with meritless claims and counterclaims,[2] implied that the Walkers had violated his medical privacy, intimidated them, and deliberately used Montana's legal system to beat the Walkers down, to frustrate their contract with Emmerson, and to cause them expense and emotional distress.

¶47    In all likelihood, Johnson and his trial counsel violated Montana's champerty statutes, §§ 37-61-408 and -411, MCA, by encouraging, funding, and prosecuting this lawsuit in Emmerson's name against the Walkers.

¶48    Accordingly, there is ample clear and convincing factual evidence in the record here that Johnson acted with malice as defined in § 27-1-221(2)(a) and (b), MCA. Indeed, Johnson and his counsel engaged in the same sort of "legal thuggery" that we condemned in *Seltzer v. Morton*, 2007 MT 62, ¶ 180, 336 Mont. 225, 154 P.3d 561. In

---

[1]  I note that Emmerson's lawyer on appeal, Karl Knuchel, was Johnson's lawyer in the trial court when Johnson was involved in his chicanery. Johnson is represented by different counsel in this appeal.

[2]  For example, Johnson threatened the Walkers with claims for the rental of a private jet aircraft to attend the trial—to the tune of between $58,000 and $145,000.

that case, we affirmed awards of $100,000 in punitive damages against Morton and $9.9 million in punitive damages against Morton's counsel, Gibson, Dunn & Crutcher (GDC). *Seltzer*, ¶¶ 1, 12. Like Morton and GDC in *Seltzer*, Johnson's impositions on the Walkers, both out of court and in, were little more than a rich-man's game to bully, brow-beat and buy what he wanted at any cost, and to misuse Montana's courts in doing so. For Johnson to now come before this Court and attempt to cloak his outrageous conduct in the mantel of the Article II, Section 16, right of access to the courts, Opinion ¶ 26, is a disgrace to Montana's Constitution.

¶49 Among other things in *Seltzer*, we observed:

> The "essence" of our judicial system is not simply the resolution of disputes; rather, it is the resolution of *legitimate* disputes. Baseless lawsuits prosecuted in furtherance of ulterior motives have no place in our courts. Moreover, the sort of saber-rattling, chest-thumping approach typified by the comment of GDC's counsel, trivializes the devastating effects on the health, reputations, and fortunes of the real people who are maliciously and abusively sued. For the ordinary citizens who are the victims of such a lawsuit, it may be the most horrific experience of their lives. Indeed, those effects are not merely the collateral damage of some run-of-the-mill litigation battle between attorneys. Rather, the defendants in such cases are the innocent casualties of the war.

*Seltzer*, ¶ 179. Ironically, Dr. Walker avoided being a casualty of the war in Iraq, Opinion, ¶ 8, only to become collateral damage in Johnson's legal wars in Montana.

¶50 Johnson's conduct, and that of his trial attorney in this case, was reprehensible and repugnant to Montana's notions of fairness and justice. In my view, Johnson caught an undeserved windfall in the court's determination not to award substantial punitive

damages against him.  Were I the trial judge, Johnson would be leaving Montana for California on a bus with but the shirt on his back.

¶51   I concur and dissent.


/S/ JAMES C. NELSON