

DA 10-0242

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 74

IN THE MATTER OF:

D.K.D.,

          Respondent and Appellant.

APPEAL FROM:    District Court of the Tenth Judicial District,
In and For the County of Fergus, Cause No. DD-2009-01
Honorable E. Wayne Phillips, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Joslyn Hunt, Chief Appellate Defender, Lisa S. Korchinski, Assistant
                Appellate Defender, Helena, Montana

        For Appellee:

                Steve Bullock, Montana Attorney General, Matthew T. Cochenour,
                Assistant Attorney General, Helena, Montana

                Thomas P. Meissner, Fergus County Attorney, Lewistown, Montana

                      Submitted on Briefs:  February 23, 2011

                                    Decided:  April 14, 2011

Filed:

                    _____
                              Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     D.K.D., a seriously developmentally disabled individual, was committed by the District Court to the Montana Development Center (MDC) for a period of one year. He does not appeal from the order of commitment, but does appeal from the portion of the commitment order that authorized MDC staff and treating professionals to administer medication to him on an involuntary basis, pursuant to MDC policy. For the reasons set forth below, we affirm.

## ISSUES

¶2     A restatement of the dispositive issue on appeal is whether the District Court committed error, much less plain error, when in its order of commitment, it authorized MDC staff to administer medication to D.K.D. on an involuntary basis pursuant to MDC policy.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     D.K.D., who is now twenty-three years old, began receiving mental health treatment when he was six years old after he displayed out-of-control behavior and started a fire in his home. He suffers from both a developmental disability and mental illness, and has been in and out of treatment centers in Montana and throughout the United States since he was seven years old. D.K.D. has a history of behaving in a manner that places himself and others in danger, and he has made multiple suicide attempts over the years. He has also received several diagnoses over the course of his life, including oppositional defiant disorder, borderline personality disorder, and mild mental retardation. At 6' 4" and 400 pounds, D.K.D. is morbidly obese and has a history

of difficultly functioning in a community environment, poor psychosocial support and resources, and refusal to engage in personal care.

¶4     In the last three years, D.K.D. has received treatment in both community and institutional settings. He has been in and out of Montana State Hospital (MSH) and MDC since 2005. From January to August 2009, D.K.D. received community-based care through Creative Options, Inc. in Lewistown, Montana. During his tenure in Lewistown, D.K.D. lived in his own apartment and received 24-hour care and supervision from Creative Options staff. In August 2009, D.K.D.'s case manager requested the State file a petition for involuntary commitment after D.K.D. repeatedly engaged in behaviors that posed risk of harm to himself and the Creative Options staff.

¶5     Upon the filing of the State's petition for involuntary commitment, D.K.D. was appointed counsel and referred to the Residential Facility Screening Team (RFST) to determine the most appropriate placement for him. The RFST concluded D.K.D. was seriously developmentally disabled, posed an imminent risk of harm to himself and others, and could not be effectively or safely treated in a voluntary community setting. The RFST recommended a community treatment plan that required the participation of a medical doctor, a psychiatrist, and a mental health counselor.

¶6     In September 2009, before a hearing on the State's petition was held, D.K.D. was admitted to MSH on an emergency basis and eventually involuntarily committed, after he made numerous serious threats to harm himself and the Creative Options staff. D.K.D.'s case manager stated that the staff was fearful of D.K.D.'s physical size and violent, tempestuous outbursts, and felt they had neither the knowledge to assist D.K.D. nor the

3

ability to control him. While at MSH, D.K.D. repeatedly attempted to harm himself and threatened other MSH patients and staff. D.K.D.'s response to medication while at MSH was unpredictable as well because, while he generally took his medication willingly, there were other times when he refused to do so.

¶7     After several months at MSH, D.K.D.'s treating physician, Dr. Carlson, requested that the State petition to have D.K.D. committed to MDC because Dr. Carlson believed MDC would be better equipped to meet D.K.D.'s specific mental health needs. In his January 21, 2010 Psychiatric Evaluation for Recommitment, Dr. Carlson and the MSH E-wing treatment team recommended D.K.D. receive long-term care at MDC with a strict behavior plan as the most appropriate treatment. Additionally, Dr. Carlson stated that due to D.K.D.'s extreme lability (defined as "characterized by rapidly shifting or changing emotions, as in bipolar disorder and certain types of schizophrenia; emotionally unstable" by *Mosby's Medical, Nursing, & Allied Health Dictionary* 879 (Kenneth N. Anderson et al., eds. 4th ed., Mosby 1994)), an existing order that authorized the administration of involuntary medication was an important tool and should be continued in the event D.K.D. "again reach[es] a prolonged period of oppositional, self-destructive, and/or other violent behavior."

¶8     On January 26, 2010, the State filed a petition for the involuntary commitment of D.K.D. to MDC. The District Court again appointed counsel to represent D.K.D. and referred him to the RFST for a recommendation of appropriate treatment. The RFST concluded D.K.D. was seriously developmentally disabled, and posed an imminent risk of harm to himself and others "due to his self-injurious behavior, suicide threats, physical

4

aggression towards others, verbal threats to harm or kill others, and his physical size." The RFST recommended D.K.D. be committed to MDC for up to one year and that MDC follow a multidisciplinary team approach to D.K.D.'s treatment.

¶9 On March 16, 2010, the District Court held a hearing on the petition for involuntary commitment. Present at the hearing were D.K.D., D.K.D.'s attorney, and the prosecutor. Dr. Carlson and the chairperson of the RFST, Leslie Howe, appeared via videoconference. During the proceeding, Howe explained the rationale behind the RFST's recommendation. Near the end of the hearing and consistent with his prior written report, Dr. Carlson informed the District Court that the order authorizing MSH staff to administer medication to D.K.D. involuntarily had been "one of the most important tools" in D.K.D.'s recent treatment at MSH.

¶10 Ultimately, the District Court found that D.K.D. posed an imminent threat to himself and others and committed him to MDC for up to one year. Near the end of its order, the court inserted the following language: "D.K.D. shall be committed to treatment at Montana Development Center for a period of no more than one year from March 16, 2010. The staff and treating professionals at Montana Development Center shall have the authority to administer medication to D.K.D. on an involuntary basis, pursuant to their policy." D.K.D.'s counsel did not object to the commitment order or to the inclusion of the language quoted above. On appeal, D.K.D. does not challenge the order of commitment as a whole; rather, he appeals only the portion of the District Court's order authorizing administration of involuntary medication. D.K.D. requests that we exercise plain error review and strike that language from the court's order.

**STANDARD OF REVIEW**

¶11 At the outset, we resolve the conflicting standards of review presented by the parties in their opening briefs. Relying on *In re L.S.*, 2009 MT 83, ¶ 18, 349 Mont. 518, 204 P.3d 707, D.K.D. urges us to apply a de novo standard to the District Court's legal conclusions and statutory interpretations, and an abuse of discretion standard to the court's discretionary rulings, which include administration and evidentiary issues. Citing *In re S.C.*, 2000 MT 370, ¶ 8, 303 Mont. 444, 15 P.3d 861, the State urges us to apply the clearly erroneous standard to the court's findings of fact and the correctness standard to its conclusions of law.

¶12 We conclude that D.K.D.'s reliance on the standard of review as set forth in ¶ 18 of *In re L.S.* is inappropriate. While the *In re L.S.* Court did recite the standard of review endorsed by D.K.D., that Court actually applied the conventional clearly erroneous and correctness standards of review in its analysis at ¶ 24. Moreover, the case the *In re L.S.* Court relies on, *In re Mental Health of E.P.B.*, 2007 MT 224, ¶ 5, 339 Mont. 107, 168 P.3d 662, also correctly applies the clearly erroneous and correctness standards. Further, we have consistently applied the clearly erroneous and correctness standards in civil commitment cases. *See e.g. In re Mental Health of L.K.-S.*, 2011 MT 21, ¶ 14, 359 Mont. 191, ___ P.3d ___; *In re T.P.*, 2008 MT 266, ¶ 10, 345 Mont. 152, 190 P.3d 313; *In re Mental Health of E.P.B.*, ¶ 5; *In re G.M.*, 2007 MT 100, ¶ 12, 337 Mont. 116, 157 P.3d 687; *In re A.K.*, 2006 MT 166, ¶ 9, 332 Mont. 511, 139 P.3d 849; *In the Matter of T.S.D.*, 2005 MT 35, ¶ 13, 326 Mont. 82, 107 P.3d 481; *In re Mental Health of C.R.C.*, 2004 MT 389, ¶ 11, 325 Mont. 133, 104 P.3d 1065; *In re Mental Health of S.C.*, ¶ 8; *In re Mental*

6

*Health of L.C.B.*, 253 Mont. 1, 5, 830 P.2d 1299, 1302 (1992); *In re G.S.*, 215 Mont. 384, 390, 698 P.2d 406, 410 (1985). Therefore, we reaffirm that in a civil commitment case we determine whether a district court's findings were clearly erroneous and whether its conclusions of law were correct.

## DISCUSSION

¶13 *Issue: Whether the District Court committed error, much less plain error, when in its order of commitment, it authorized MDC staff to administer medication to D.K.D. on an involuntary basis pursuant to MDC policy.*

¶14 As a preliminary matter, we briefly address whether this case is moot in light of the fact that the court's commitment order, by its terms, expired on March 16, 2011. While not an issue raised by either party, "courts have an independent obligation to determine whether jurisdiction exists and, thus, whether constitutional justiciability requirements . . . have been met." *Plan Helena, Inc. v. Helena Reg'l Airport Auth. Bd.*, 2010 MT 26, ¶ 11, 355 Mont. 142, 226 P.3d 567 (internal citations omitted). In line with our precedent in involuntary commitment cases, the duration of which is often too short to allow issues to be fully litigated prior to respondent's release from the institution, we conclude that this issue is not mooted by the fact that the District Court's order expired on March 16, 2011, because it falls under the "capable of repetition, yet evading review" exception to the mootness doctrine. *See e.g. In re D.M.S.*, 2009 MT 41, ¶ 10, 349 Mont. 257, 203 P.3d 776; *In re Mental Health of D.V.*, 2007 MT 351, ¶¶ 30-32, 340 Mont. 319, 174 P.3d 503 (internal citations omitted); *In re N.B.*, 190 Mont. 319, 322-23, 620 P.2d 1228, 1231 (1980).

¶15     D.K.D. argues for the first time on appeal that the District Court erred when it authorized MDC staff and treating professionals to administer medication to him on an involuntary basis in accordance with MDC's policy.  D.K.D. argues the District Court's order places his liberty in jeopardy and our failure to review the issue places the judicial process and its integrity at stake.  D.K.D. urges us to review his claims under the common law plain error doctrine and strike the portion of the District Court's order of commitment authorizing MDC to involuntarily administer medication to D.K.D. pursuant to MDC's policy.

¶16     D.K.D. was represented by counsel at the commitment hearing, and D.K.D. did not object to this portion of the order in the District Court.  Generally, we do not review issues raised for the first time on appeal.  *In re A.N.W.*, 2006 MT 42, ¶ 41, 331 Mont. 208, 130 P.3d 619.  Additionally, we invoke the common law plain error doctrine "sparingly and only in those limited situations where failure to review the alleged error may result in a manifest miscarriage of justice or compromise the integrity of the judicial process."  *In re Mental Health of A.S.F.*, 2008 MT 450, ¶ 5, 340 Mont. 45, 199 P.3d 808 (internal citations omitted); see also *Emmerson v. Walker*, 2010 MT 167, ¶ 28, 357 Mont. 166, 236 P.3d 598 ("The doctrine is invoked 'sparingly' in criminal cases and 'only on rare occasion' in civil cases.") (internal citations omitted).  We have recently held that, to apply the common law plain error doctrine, the "error must be plain" and we must be "firmly convinced" that an aspect of the proceeding, if not addressed, would result in one of the aforementioned consequences.  *State v. Taylor*, 2010 MT 94, ¶ 17, 356 Mont. 167, 231 P.3d 79.

8

¶17 We conclude that there was no plain error here, and that the record does not establish that failure to review this case would result in either a miscarriage of justice or a compromise of judicial integrity. We so conclude because the portion of the District Court's order authorizing MDC staff and treating professionals to involuntarily administer medication pursuant to MDC policy, was mere surplusage. Generally, when we determine that plain error review is not warranted, our analysis of the issues ends there. However, given the uniqueness of the situation before us and that it is capable of repetition, we deem it important to expand on our rationale.

¶18 As noted, D.K.D. challenges only the portion of the District Court's order that authorizes MDC staff and treating professionals to involuntarily administer medication to him pursuant to MDC's policy. On appeal, D.K.D. mischaracterizes the language of the order, arguing that the District Court does not have the authority to "order involuntary medication" for D.K.D. The District Court did not do so. Under the plain language of the court's order, MDC staff and treating professionals are merely authorized to administer medication involuntarily *pursuant to their policy.*

¶19 Title 53, chapter 20, MCA, governs the involuntary commitment of developmentally disabled persons. Unlike Title 53, chapter 21, MCA, which addresses the commitment of mentally ill persons and specifically permits a court to direct the administration of involuntary medication, *see* § 53-21-127(6), MCA, chapter 20 contains no such provision. In an involuntary commitment hearing under chapter 20, the only decision relegated to the district court pursuant to § 53-20-125(7), MCA, is whether to commit the person to a residential or community-based facility, or dismiss the petition. A

9

district court has no statutory authority to order a particular course of treatment for these committed persons—this is the duty and responsibility of MDC staff and treating professionals. *See* § 53-20-145, MCA (requiring medication to be administered only upon the written order of a physician, and assigning responsibility for medication to the attending physician and the individual treatment planning team); Admin. R. M. 37.34.1101 to 37.34.1114 (2011).

¶20 The language of the District Court's order authorizing MDC to undertake the administration of involuntary medication pursuant to policy does no more than authorize MDC to do what its policies in place permit it to do. The court's language is therefore gratuitous. Should D.K.D. take issue with an MDC policy regarding administration of involuntary medication or any other MDC protocol, that concern must be raised with MDC or the Department of Public Health and Human Services, and failing resolution, in a court action specifically challenging such policy. The medication administration policies of MDC are beyond the purview of the District Court's statutory authority and its order of commitment.

¶21 In light of the fact that the District Court had no authority to, and did not in fact, order that D.K.D. be involuntarily medicated, we decline to exercise plain error review here. However, we urge district courts to be precise in the language of their orders and to refrain from inserting gratuitous language or observations that may be construed by the parties as mandatory obligations.

## CONCLUSION

¶22 For the foregoing reasons, we decline to invoke the plain error doctrine.

10

¶23 Affirmed.

/S/ PATRICIA COTTER

We concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ BETH BAKER
/S/ BRIAN MORRIS
/S/ MICHAEL E WHEAT
/S/ JIM RICE